[ PHILADELPHIA, APRIL 29TH, 1840. ]

UNANGST and Another *against* SHORTZ and Others.

IN ERROR.

Articles of agreement were entered into between two religious societies, called the Lutheran and Reformed Congregations, by which, after reciting that they had together erected a church for their mutual benefit, certain stipulations were entered into; one of which provided that the trustees in conjunction with and by consent of the elders and wardens, should have the right to elect and remove the minister ; and another article declared that no other minister should preach in the church except by consent of the regular minister and vestry. A conveyance was made of the church and ground to A. & B. in trust for the said societies, and to suffer the premises at all times thereafter forever, to be at the disposal and under the care, regulation and management of the two societies, &c. A minister was appointed by the council of the Lutheran society, to whom opposition was made by a portion of the congregation. The question was referred to the synod, who decided that an election should be held to determine if the minister so appointed should continue. A majority at this election appeared to be against him ; but the council continued him ; and his friends took possession of the key of the church and nailed up the doors and windows. A portion of the congregation invited another minister to preach in the church; and for the purpose of preparing the church, certain persons, members of the church, broke open and entered the church. *Held,* (1st,) that they had no right to enter for this purpose and were liable as trespassers. (2d,) that an action was well' brought against them at the suit of A. & B. the trustees of the land, and might be maintained notwithstanding that B. dissented and disclaimed; he having been indemnified for the costs, &c.

THIS was a writ of error to the Court of Common Pleas of Northampton County to remove the record of an action of trespass *quare clausum fregit* brought by Joseph Unangst and Christian Brown against Abraham Shortz, Jacob Herman and eleven others.

The plaintiffs were the trustees, and the defendants members of a religious society called " The German Lutheran Congregation of the Dry Lands."

In the year 1788, an agreement was entered into between this congregation and another called " The German Reformed Congregation of the Dry Lands;" in which, after reciting that they had .

together erected a church upon a certain lot of ground taken up by them for that purpose and for their mutual benefit, they agreed upon the following rules and regulations " for the preservation of the church, its discipline and government."

" 1st, That the above described piece of land shall forever remain the land, and on which no more than one church and school-house in common are to be erected.  2d, These 7 or 8 acres school and church land, shall, in case of purchase, be jointly bought and paid for by both congregations.  3d, The number of trustees which have just now been elected, shall always be retained (remain in office) in our church; in case some way or other a vacancy of a trustee should take place, said vacancy shall be filled up by the majority of votes (of the congregations.)  4th, The trustees shall in conjunction with and by consent of the elders and wardens have the right to elect and remove the minister.  5th, The resolution of the trustees, elders and wardens, as regards the election and removal of the minister, shall be fully binding, if two-thirds are agreed.  6th. At the election of an elder and warden, as well as the election of a trustee by the congregation, the minister shall have an equal right in electing elders and wardens (to vote for,) shall however have but one vote.  7th, In case one of these two congregations should intend to call or elect a minister, he shall be bound to prove his ordination.  8th, No (other) minister shall preach in this church, except by the consent of the (regular) minister and vestry, whose part it is at such time to direct public worship.  9th, Public worship shall be held in the same manner as heretofore, to wit, the Reformed as well as the Lutheran congregations shall hold public worship every two weeks (in rotation) ; one congregation shall have as much right as the other; but should, for certain reasons, the Sundays be changed (the preaching in rotation every two weeks), it shall be decided by the majority of the vestry in both congregations.  10th, The elected trustees shall, during worship, occupy in church one of the front seats; the elders and wardens shall have the next seat.  Those (of the trustees, &c.) shall occupy the front seat, on whose side worship is held.  11th, The expenses requisite for administering the Lord's Supper, shall be taken from the collection money.  12th, There shall be rendered an annual church account, and the money remain (kept) in common, until the church is paid ; after this each congregation shall apply their collection money to their benefit, without being accountable for it to the other.  13th, Should it become necessary to erect or repair a school-house, both congregations shall build and keep it in repair, without taking the costs from the collection money, except it be done by mutual consent of both congregations.  14th, Each holy day a collection is to be taken up, which is always to go to the repairs of the church.  15th, Both congregations shall have the right to erect

(Unangst *v.* Shortz.)

tomb-stones for their deceased (friends.)    16th, At no time whatsoever (now and never) no minister, whoever he may be, shall have permission to preach in this church, except he be a Christian Reformed or a Christian Lutheran minister."

This agreement was signed by four trustees, four elders and two wardens.

On the 10th of June, 1794, Sarah Wistar executed a conveyance of the premises to Matthias Gress and Christian Brown upon the following trust.

" In trust nevertheless, for and as a scite for one or more houses of religious worship and a burial place for the use of the said German Lutheran and German Reformed Congregations or religious societies aforesaid.    And upon this further trust and confidence, that they the said Matthias Gress and Christian Brown, and the survivor of them his heirs and assigns, shall and will permit and suffer the said premises hereby granted, and the buildings thereon erected and hereafter to be erected from time to time, and at all times hereafter forever, to be at the disposal and under the care, regulation and management of the said two religious societies or congregations aforesaid, and to and for no other use, intent or purpose whatsoever."

On the 21st of April, 1837, Matthias Gress, the survivor of these trustees, executed a conveyance of the premises to Joseph Unangst and Christian Brown on the same trusts.

A difference of opinion arising in the German Lutheran Congregation, respecting the appointment of a minister, who had been elected, as alleged, by the vestry, the question was brought before the synod, which met at Reading in May, 1834, which determined that the matter ought to be referred to the congregation.    An election was accordingly held, when a majority of the congregation declared against the Rev. Mr. Yeager, who had been appointed by the vestry.    He continued to preach however under the authority of the council.    The party in the church who approved of his election, got possession of the key of the church and nailed up the doors and windows.    The defendants broke open the windows and entered the church; for which alleged trespass this action was brought.

On the trial before Banks, President, the plaintiffs' counsel gave in evidence the agreement and conveyances above mentioned and the fact of the entry by the defendants.

The following points of evidence were ruled—

1st. The defendants' counsel offered in evidence a declaration or disclaimer by Christian Brown, one of the plaintiffs, as follows:

"Whereas, I have understood that my name has been used as one of the plaintiffs in this suit. Now I hereby testify and declare that my name has been so used without and against my consent, and that I was and am unwilling that my name shall be so used; and I do therefore hereby disavow the said suit or having any part therein. And I further certify, that I have always been willing and yet am willing, that the members of the religious society called "The German Evangelical Lutheran Congregation of the Dry Lands," should have permission to use the premises usually called the Dry Land Church, (for an alleged entry into which, I understand this suit has been brought) for purposes of religious worship; and that they had my permission for entering the said church, for the purposes aforesaid, so far as I could give the same, on the occasion of the alleged entries, for which I understand this suit has been brought. Witness my hand and seal this 22d day of August, A. D. 1837."

It appeared that a bond of indemnity against the costs and charges of the suit had been given to him.

The paper offered was objected to by the plaintiffs' counsel; but admitted by the Court and exception taken.

2d. Parol evidence having been given to prove that the defendants were members of the congregation, a witness was offered to prove that Abraham Shortz, one of the defendants, was the son or grandson of George Shortz, one of the original contributors to the building of the church. This was also objected to, but admitted and exception taken.

3d. The defendants offered evidence to prove, that the synod had decided that there was no regular pastor of the church at the time the trespass was committed. This also was objected to, but admitted for the purpose stated, and exception taken.

4th. The defendants offered the list of voters at the election ordered by the synod in 1834. This was also objected to, but admitted, and exception taken.

5th. The minutes of the synods held in 1834 and 1835, relating to the questions in dispute in the congregation, were offered in evidence, objected to, admitted, and exception taken.

6th. The defendants offered in evidence a charter of incorporation granted to a part of the congregation under the name of "The German Evangelical Lutheran Church of the Dry Lands," on the certificate of the judges of the Supreme Court, dated the 3rd

of March, 1837, together with the minute book of the congregation; this was also objected to, but admitted, and exception taken.

7th. The plaintiffs offered in evidence six protests against the charter of incorporation granted to the German Evangelical Church of the Dry Lands signed by divers members, which were objected to by the defendants' counsel, and rejected by the Court and exception taken.

8th. The defendants offered in evidence a notice to the plaintiffs dated the 15th of May, 1837, and signed by Abraham Shortz and others, styling themselves the " Trustees of the German Evangelical Lutheran Congregation of the Dry Lands," demanding the use of the church and premises for the purpose of religious worship. This was objected to by the plaintiffs' counsel, but admitted by the Court and exception taken.

9th. The defendants offered in evidence a notice from the trustees and wardens of the " Reformed Church of the Dry Lands," to the church council of the Lutheran Congregation, asking the use of the church and premises for the Evangelical Lutheran Congregation; which also was objected to, but admitted, and exception taken.

The evidence given on the trial is sufficiently stated in the charge of the learned judge, which was in substance as follows:

The right to the property, which is the subject-matter of this dispute, appears to have originated as early as the 5th of June, 1788. On this day, articles were signed by the officers of the two congregations. It appears that they had in the first instance taken up the land as vacant and selected a situation for their house of worship, and built it. The property was to remain " theirs and their posterity's forever." This house was jointly built. This article provides for the erection of but one house of worship and a school-house. Afterwards another agreement was made, which provided for the purchase of the property. The land was to be purchased and paid for by both congregations jointly. Each congregation was to hold an equal right, and contribute an equal portion to enable them to acquire the right to the property. By their articles of association no minister was permitted to preach in the house, but by the consent of the regular minister and vestry. Preaching in case of a vacancy does not appear to have been contemplated, nor is it provided for. The entire agreement demonstrates an intention, that one congregation was to enjoy the same right as the other. The equality of right, extended to all the buildings, and to the grave yard. Thus matters rested until the 10th of June, 1794, when a purchase was consummated of the property, and a deed of trust made by Miss Wistar to Matthias Gress and Christian Brown as trustees.

(Unangst v. Shortz.)

In this deed the territory is described over which the right to indi-viduals to worship in this house extended. It was extended to the township and its neighbourhood. This right was not limited to those who had contributed to the first purchase, but to those who resided within this territory, who should become regular members of the churches, or either of them. They thought the congrega-tions might enlarge, so as to require more than one house of worship; and therefore, in their deed, provide for the erection of *one* or *more* houses of worship. By the trust deed, the trustees derived no indivi-dual right to, or interest in the property, except as members of one of the congregations. They had no right to rents or profits—no right to build, improve or repair. This was left to the two congre-gations. The trustees were merely legal recipients of title, and no more. The two congregations who are the *cestui que trusts* of the property, were in the possession of it at the time this purchase was made, and deed executed; and so continued until 1834, a period of forty years. During all this time, the two congregations worship-ped in this house, and enjoyed the property in peace and harmony. During all this time there is no evidence that the trustees in the deed, as such, had the actual possession of the property. The *cestui que trusts* had its full enjoyment. Christian Brown, one of the trustees, must have died before 1837; for on the 21st of August of that year, Matthias Gress, the surviving trustee, conveyed the legal title on the same trusts to Unangst and Brown, the plaintiffs. Gress could convey in no other way than subject to the trusts. He could not enlarge, diminish, or vary the trusts. Any attempt to accom-plish such change would have been a nullity. As trustees, they held jointly, not one for each congregation, but both for the two congregations. They as grantees held in trust for the two congrega-tions under the deed, with no individual interests, except as members. I speak now of them as trustees under the deed, and not as officers of the church. Their rights in this suit are blended together; this should be kept constantly in mind, in this investigation. In the year 1834, Mr. Yeager, the pastor of the German Lutheran Congregation died. The first difficulty in this congregation had its origin in their attempt to supply the vacancy occasioned by his death. In 1834, an election was had by the church council, which consisted of four trustees, four church wardens and two elders. This church council had a right to elect a minister for the congregation; and on counting the votes, Mr. Yeager, son of the former pastor was elected. This selection did not give satisfaction to all the members of the church; and the matter was brought before the next synod. In this body of Christians this is but an advisory body, in matters pertaining to church judicature. Entertaining the opinion that the election of Mr. Yeager was not legal, the synod recommended a new election. It was also recommended that the election should be by the votes of the members of the congregation, and not by the church council.

This recommendation was acceded to by those of the congregation who were attending the synod: the congregation also acceded to it; and an election was held in the manner indicated by the synod, and at a place and time of which general notice was given.   This election was to determine the single question, whether Mr. Yeager should be the minister of this congregation or not.   The result was against Mr. Yeager, and he was rejected by a majority of votes. It appears to have been understood, generally, that the result of this election was to end the controversy.   The election was full, and conducted with as much partizan zeal, at least, as was consistent with that Christian forbearance which one brother in the church should extend to another.   Unfortunately for this congregation the controversy was not terminated.   This election appears to have been the last occasion on which the two parties met together—each party endeavoured to keep up a separate organization—each party claimed to be the church—each party insisted that the church offices were all full except that of pastor.   In 1836, an application was made to the synod to have this trouble adjusted.   The synod responded that they could only advise, and that they had given this advice.   It will readily be admitted that the advice given by the synod was good, and it is much to be regretted that this respectable congregation had not acted on the advice thus wisely given.   In 1836, the friends of Mr. Yeager filled all the vestry, or offices of the church council, and elected Mr. Yeager as their minister.   A church officer cannot be turned out without notice and trial according to the rules of the church.   Nor can an office be declared vacant without some notice to the then incumbent.   Each party separately used the house for church purposes.   They did not mingle in divine worship, nor in any deliberations relating to church matters.   How then was this election effected ? was it on notice to the congregation generally, or only to the Yeager part of it ?   When the council was filled, what notice was given ? was it to the church generally, or only to the Yeager party?   You will examine this question carefully, and decide it with caution.   To fill the offices with a view to elect a pastor, a notice should have been given generally, and not to that part only, which was favourable to a particular individual.   After the election by the members generally, at which Mr. Yeager was rejected, his friends alone could not rightfully fill the vestry, so as to bind their opponents, without notice.   The vestry, with the consent of the congregation, had yielded up their right, as regarded the election of Mr. Yeager, to the members of the congregation at large.   They had decided this question.   After this it would not be fair or legal, that officers should be raised by the party defeated, to call the rejected candidate.   Such a procedure would not be regular, nor would it bind the adverse party.   This was one of the first steps towards a separation.   By the election of the congregation at large, in the rejection of Mr. Yeager, the office of minister in the

church was declared vacant. This was the act of all, and as such was binding upon all. The vanquished party, as such, by a separate action of their own, could not fill this office by a call of the rejected candidate, against the solemn act of the entire church. The election by the congregation was the act of all. The call of Mr. Yeager, afterwards, was but the act of a part. After his rejection by the vote of all, it was in bad faith for a part again to elect him, and it was in bad faith in him to accept the call. This election in 1834 by the congregation, was the last joint act of the conflicting parties. After this, each party kept up, or attempted to keep up, a separate organization. Each party held on to the church property, and to church membership. After the rejection of Mr. Yeager, when the office was declared vacant, if the congregation, as such, had gone on and filled the offices, what these officers might have done would have been binding. In matters relating to the church, a majority fairly expressed on any subject within the range of their authority, must govern, in the absence of all rule to the contrary. Minorities, however, have their rights as well as majorities. They have a right to be present and to be heard. The opportunity of participating must not be denied them. Their right to participate cannot be cut off by the act of the majority. This call of Mr. Yeager, by his friends, appears to be the first distinct and separate act. You will say where the first fault was—which party set up first for itself. You will inquire and determine which party consummated the act of usurpation. It is evident that neither party intended to separate from or abandon the church. Each party clung to the church, and whatever they did was in support of their rights as church members. What they did was as disputing church members, and could not work a forfeiture of the right of fellowship in the church. The next matter which I will notice is the charter which was obtained by the one party. Much that I have said in regard to the last call of Mr. Yeager, is applicable to this point. A religious community, such as this was constituted by its articles of association, might alter its rules and regulations. This change might be effected by an act of incorporation legally invoked. How should this be done? It must be done by the congregation. The congregation should be notified. As being preparatory to a change in their constitutional existence, the object of the convening the members should be communicated in the notice. This would apprize the members of what was to be done, and if they did not attend, they could not complain. When thus assembled, the decision of the majority would be binding. There is no other way of determining questions in such a community, unless their articles or rules dictate some other mode. Here no other rule was dictated. Here there is a total absence of all the evidence requisite to establish, that the congregation ever agreed to, or authorized any one to make and obtain this charter. No meeting was ever called—no notice was

(Unangst *v.* Shortz.)

ever given to the congregation on the subject of this charter. Those in favour of it knew it no doubt; but those opposed to it were designedly kept in utter ignorance of what was in progress. I may safely ask, where is the evidence that the congregation ever decided that the charter should be obtained? The absence of all evidence on this point is sufficient to warrant the conclusion that no such proposition was ever submitted to the action of the congregation. When or how this charter was concocted we have not been informed. All that we knew of it is, that it was carried round through the country, and the signatures which are to it were thus obtained. This is not the assent which is requisite to bind the congregation. It would bind those who signed it, but beyond this it would not bind any other member of the congregation. Here no deliberation, or act of the members, was had jointly, touching this charter. Here there was no joint consultation or discussion by the members on the subject. Nor was there any opportunity for that joint deliberation, advice, consultation, discussion and action by the members of this church, by which they ought to be bound. It is all idle, and repugnant to good sense and moral honesty, to tell me that those who were opposed to this charter might have followed it to the Supreme Court, at Philadelphia, and to the executive, at Harrisburg. They were not bound to pursue its trail in obtaining this public highway assent of part of the members, nor before the Supreme Court and executive. To obtain the assent of one member at one time, and another at a different time, successively, and in detail, will not bind the congregation, unless every member should assent to it. It would not bind him who did not assent to it. The members should have been assembled in congregational council. They should have deliberated jointly. They should have acted unitedly. They should have expressed their assent and dissent in their associative capacity, and then the result duly announced, would have been binding upon all the members. Any other mode of proceeding would be subversive of the first principles of justice, and leave no safety to the members. If I am right in what I have said, this charter neither alters nor diminishes the right of those who did not agree to it. It therefore can have but little, if any, operation in this cause. It gave those who are parties to it no right, against the other members who are not parties to it. As to them it is inoperative. I do not think, however, that the obtaining of this charter made the parties to it aliens to the church. They did not thereby relinquish church property, nor abdicate church membership. They still clung most pertinaciously to both. They did not set up adverse to the church, nor did they claim the right to exclude their differing brethren. The charter was irregularly obtained. The appointment or call of Mr. Yeager was irregularly made. Neither was the act of the church. Both parties were wrong. Neither, in my opinion, forfeited their rights as members

of the church. It was in each case an error in the manner of proceeding. They acted separately to be sure, but neither party intended to separate from the church. Each party was pursuing what they supposed to be their interests, and increasing these rights as they supposed. There is nothing in the case to show that either party intended to abandon the church, but all the evidence goes to show that they did not. Thus distracted, the party opposed to the charter determined to keep the charter party out of the house. They took the key from the place in which it had usually been kept. They locked the door, and nailed the windows, and placed an armed guard on the property. They appear to have determined to bring this matter to a close, and test their rights in a Court of law. On the day of the alleged trespass, the defendants went to prepare the house for worship on the next day. It is clearly proved that this was their intention. They obtained the consent of the vestry of the Reformed Church; they also obtained the consent of one of the trustees who held the legal title. The key could not be found. They demanded it, but it was not given, and that it should be given was expressly forbidden. Thus they must be deprived of their right to worship in that house, at that time, or open the house at their peril. They risked the latter. In opening the house, no injury was done beyond what was necessarily done, in opening the door and window. In doing this, did they subject themselves to this action? On the trial we let in almost every thing that was offered. The door was opened wide so that the merits of the whole case might be disclosed, and this important controversy ended. It has been ably argued. The great question is, can it be sustained? Technicalities have been spoken of on both sides. There is an unfounded prejudice in the community on this subject. It is essentially necessary to a fair trial, that nothing should be tried but what is placed upon the record. This is equally true in civil and criminal cases. The defendant comes prepared to meet the charge or claim made against him on the record. This record is the only security he has that he will not be called upon to answer for the same matter again. The forms of action as they are well settled, must be observed. It is essential to the due administration of justice that they should be. In many cases they have become rules of right, and criterions of property, to depart from which would be destructive of the best interests of the public. With regard to trespass to real property, the rule is this. The essential point necessary to sustain the action, is the possession of the plaintiff. The injury to be redressed, is to the possession. Unless that party was in actual possession at the time the injury complained of was done, the action of trespass will not be supported. This is the general rule. There is in Pennsylvania a constructive possession, which will enable the party to support this action. Take the case of unimproved land, then the title casts the possession upon the

·owner,· and he may support trespass. This does not however apply to a case where any one is in actual possession adverse to his right. Were the plaintiffs in the actual possession of the property? If not, they cannot recover, if any others were in actual possession at the time of the entry made. How was the actual possession? The plaintiffs claim by virtue of their trust deed. Had they possession under this trust deed? You will decide whether the trustees under the deed were in actual possession, or whether the trustees of the church were in the actual possession; for if they were, then the trustees under the trust deed could not sustain the action. It is not pretended that the German Reformed congregation were out of possession; for the plaintiffs disavow all intention to displace them. It is not pretended that the Yeager portion of the Lutheran congregation was out of possession; the whole case on the part of the plaintiff, asserts that they were not. The two congregations have been in the uninterrupted possession for forty years. The trustees in the deed were trustees of the churches. Did the plaintiffs take possession? If so, when and how? Who was in possession is a fact for you to decide. The *cestui que trusts* had rights superior to those of the trustees. He who has the inferior right cannot recover at law against him who has the superior right. If the church trustees of the German Reformed had possession, and the trustees of the Yeager part of the Lutherans had possession, that is actual possession; were the trustees in the deed in the actual possession at the same time? This would be a mixed possession. There would then be three distinct actual possessions at the same time. You will then decide who was in the actual possession at the time of the entry. If the plaintiffs were in the actual possession at the time, then they could sustain this action: if they were not then in the actual possession, they could not sustain this action. Were the defendants in this case members of the congregation, and were they in the actual possession at the time, by the direction of the trustees of the church; and did they enter by the direction of the trustees of the church for the purpose of preparing the house for worship, on the next day? If so, the plaintiffs cannot recover. You will decide from all the evidence, what, and how, the possession was. Christian Brown, one of the plaintiffs and one of the deed trustees, disavows this action, and by his writing filed, acknowledges that he gave the defendants authority to do what they did do. It is also proved that he did give the defendants permission to enter, and was present when the entry was made. It will be observed that the defendants were a part of that branch of the church which was opposed to Mr. Yeager. This branch would appear to have been the most numerous, from the fact that he was rejected. The defendants were not strangers, who entered to do injury to the property, but members asserting their right to worship in that house. The plaintiffs were joint

(Unangst v. Shortz.)

trustees.   Their powers were equal.   Could the one trustee bring trespass against the other trustee?   If Brown had done what he authorised the defendants to do, could Unangst have brought and sustained an action of trespass against him, in a court of law?   I think not.   If Unangst could have had any remedy, it would not have been trespass.   Do not the defendants then stand in relation to Unangst, in the same right that Brown could have stood, if he had done what they did by his permission?   They acted by his authority.   They may invoke his power for their security.   The defendants assert no right against the plaintiffs.   They did not turn them out.   They merely entered, claiming a right to enjoy the property in common with the plaintiffs.   They do not attempt to exclude the plaintiffs.   The plaintiffs claim damages at law against the defendants.   The defendants excuse themselves by showing a permission from one of the plaintiffs.   In cases of tenants in common, this excuse would be available : so it would with joint tenants or coparceners.   Why not in this case?   It is also in proof that the trustees of the German Reformed congregation gave the defendants permission to enter.   If the trustees of the German Reformed had done what they authorised the defendants to do, would this action be sustainable?   I think not.   It is said it would have been a violation of the trust.   But admit it to be so, would trespass be the proper remedy against the *cestui que trusts*, being in actual possession?   I think not.   The possession of one tenant in common is the possession of his co-tenant.   If one tenant in common enters into possession, his co-tenant being in possession, trespass will not lie against him.   But if one tenant in common turns the other out, trespass will lie.   The facts are fully left to you as to the possession and the entry.   If the plaintiffs were in the actual possession of the property, and the defendants entered with the consent of one of them, they could not, on any principle of law and equity be considered trespassers.   If they were in possession, and one of them permitted the defendants to enter, it would virtually give the possession to the defendants for that particular purpose; and so far the plaintiffs, or one of them, would have parted with his possession, and he could have no colour or pretence whatever, to sue them in trespass.   As to the possession of the one granting permission, there would have been no violation whatever.   His authority was equal with that of his co-trustee, and if he gave permission, then there would be no violation of possession, either actual or constructive.   If then you believe that the defendants entered with the consent of one of the plaintiffs, and by virtue of his authority, and did not do more than they were authorised to do by him, then the plaintiffs cannot recover.   Unless the plaintiffs had the actual possession of the property at the time of the entry by the defendants, they cannot recover.

The plaintiffs' counsel excepted to this charge; and a verdict

having been rendered for the defendants, a writ of error was taken, and on the return of the record the following errors were assigned.

" 1st. The Court err in saying that all the defendants had done could not work a forfeiture of the right of membership in the church, and that they could justify in this case under their claims as members.

2d. They err in all they say in regard to the election of Mr. Yeager in 1836, and in the whole application of the election of 1834, and the proceedings in regard to Mr. Yeager to the present contro-. versy.

3d. The Court err in saying that the defendants could invoke the authority of Christian Brown for their security; and in supposing that Brown had any authority over the affairs of the Lutheran congregation, or that he could give any valid permission under which the defendants could justify.

4th. The Court err in all they say in regard to the possession of the church trustees, and of the congregations respectively; and in supposing that their use of the church interfered with or was adverse to the actual legal possession of the plaintiffs, or prevented their maintaining this suit.

5th. They err in supposing that the defendants are in any better condition by reason of their not claiming (on the trial) to exclude the real owners or persons entitled to possession of the church property.

6th. The Court err in their decisions noted in the several exceptions to evidence."

The case was argued by Mr. *A. E, Browne* and Mr. *Hepburn*, for the plaintiffs in error, and by Mr. *Maxwell* and Mr. *B. Tilghman*, for the defendants in error.

For the *plaintiffs in error*, were cited, The People v. *Runkel*, (9 *Johns. Rep.* 156; S. C. 8 *Johns. Rep.* 464.) *Willis on Trustees*, 206. *Selw. N. P.* 1019. *Stambaugh* v. *Hollabaugh*, (10 *Serg. & Rawle*, 362.) 6 *Bac. Abr.* 585, 589. 2 *Str.* 1238. The Six Carpenters' Case, (8 *Co.* 290.) *Willis on Trustees*, 65. 1 *Cruise Dig.* 525. 3 *Am. Dig.* 494. 3 *Chitty's Gen. Prac.* 128, 129. *Willis on Trustees*, 207, 222. 3 *Harr. Dig.* 2868. *Drum* v. *Simpson*, (6 *Binn.* 481.) *Martzell* v. *Stauffer*, (3 *Penn. Rep.* 398.) *Vernon* v. *Henry*, (6 *Watts*, 193.) *Crosby* v. *Wadsworth*, (6 *East*, 602.) *Clapp* v. *Draper*, (4 *Mass. Rep.* 266.) *Stultz* v. *Dickey*, (5 *Binn.* 285.) *Commonwealth* v. *Jarrett*, (7 *Serg. & Rawle*, 460.) *Case of St. Mary's Church*, (7 *Serg. & Rawle*, 538.)

For the *defendants in error* were cited *Shepherd* v. *M'Evers*, (4

*Johns. Ch. Rep.* 136.)　4 *Kent's Com.* 311.　*Powel on Powers,* 373. *Willis on Trustees,* 65.　2 *Selw. N. P.* 488.　*Cutting* v. *Rockwood,* (2 *Picker.* 443.)　*Taylor* v. *Stockdale,* (3 *M'Cord,* 302.)　*Kennedy* v. *Furer,* (1 *Dall.* 72.)　*Addleman* v. *Way,* (4 *Yeates,* 218.)　*Shenk* v. *Mundorf,* (2 *Browne,* 109.)　*Campbell* v. *Arnold,* (1 *Johns. Rep.* 511.) *Tobey* v. *Webster,* (3 *Johns. Rep.* 468.)　*Taylor* v. *Townshend,* (8 *Mass. Rep.* 415.)　*Mather* v. *Trinity Church,* (3 *Serg. & Rawle,* 512.) *Dennet* v. *Grover,* (*Willes,* 195.)　*Bagge's Case,* (11 *Co.* 99.)　*Commonwealth* v. *St. Patrick's Society,* (2 *Binn.* 448.)　*Commonwealth* v. *The Guardians of the Poor,* (6 *Serg. & Rawle,* 469.)　*Methodist Church* v. *Remington,* (1 *Watts,* 218.)

The opinion of the Court was delivered by

SERGEANT, J.—The questions that present themselves on this record for determination, independently of the bills of exception, may be reduced to two.　1st. Whether the defendants have shown a right to break and enter the church, which is the trespass complained of.　2d. Whether, if they have not, the plaintiffs can maintain this action.

1. To determine the rights of persons claiming as members of either of the congregations by whom this church was originally erected and endowed, there is no other guide than the articles of agreement of the 5th of June, 1788, and the deed of the 10th of June, 1794, conveying the legal title of the land and premises to trustees in trust for the German Lutheran and German Reformed congregations of the Dry Lands.　By the former, the respective rights of these congregations, and the privileges, powers and duties of their officers and members are prescribed: by the latter they are placed on the footing of *cestui que trusts,* entitled as such to the protection of a Court of equity; and the legal title is vested in trustees, who possess with it the legal remedies appertaining to it, and the capacity to transmit the title to heirs or new trustees by assignment.　The articles of agreement form the fundamental rules and regulations, and are in the nature of a constitution, under which the congregations jointly and severally enjoy certain temporal and religious rights.　This mode of holding real estate in trust for religious societies, and others of a charitable nature, was frequently adopted in Pennsylvania when it was a province, instead of a charter of incorporation: and sales and grants of lands for these purposes were ratified and confirmed by act of assembly as early as 1730. The same act gave authority to any religious society of protestants within the province thereafter to take, receive and hold the same, for the uses prescribed in the grant.　Their privileges and rights are also explicitly reserved and protected by the constitutions of 1776, 1790 and 1838.　They are not incorporated bodies, in the proper sense of the term, but resemble them in this, that their trusts are of

a public character, and are specially recognised and provided for by the laws and constitution of the commonwealth. By the act of 1818 power is given to the Supreme and other Courts to remove trustees who abuse or neglect their trusts, and to call them to account. And by the late act of 1836, the chancery jurisdiction of the Courts seems extended to such societies or associations, among others.

The present is an action of trespass : the breaking and entering is admitted, but the defendants justify under their rights as members of the religious society of the German Lutheran congregation of the Dry Lands; and their rights in that respect are the subject of decision. The first question is, what right to enter belongs to them as *cestui que trusts* in the deed from S. Wistar to Gress and Brown : for the trustees are to permit and suffer the premises to be at the disposal, and under the care, regulation and management of the two religious societies or congregations, and for no other intent or purpose whatsoever. And these religious societies, their rights and powers, are only known by the articles of agreement of the 5th of June, 1788, under which they were created, and the property and privileges of all are to be held and enjoyed. I do not take into view any authority that may be supposed to be derived from the charter of incorporation obtained in 1837. We give no opinion whatever on the justification by virtue of that charter. The Court below threw it out of consideration, and it is not for the plaintiffs in error to complain of an instruction favourable to themselves. It has not been urged by either side here, nor could it properly be presented on this record for our consideration. I shall inquire only how far the defendants made out a justification as members of the German Lutheran society, and *cestui que trusts* under the deed.

That the defendants were members of the religious society of the German Lutheran congregation of the Dry Lands, mentioned in the articles and deed, seems to have been shown; and it is clear, that as such they had a full right to enter the church at all times for the enjoyment of their rights as members of that religious society, agreeably to the tenor of the articles; but it does not follow that they had a right to enter it for a purpose not authorised by them. It could not be contended, that as such members they could enter at any time and for any purpose they pleased. A member entering and breaking a window would be guilty of a trespass. A portion of the members combining and entering to pervert the building to a profane or improper use, would be equally guilty of a trespass. In *Carey* v. *Holt*, (2 *Str.* 1239,) it is laid down, that in all cases of exceeding the authority given by law, the party is a trespasser; citing *The Six Carpenters' Case*, (8 *Co. Rep.*, 2 *Roll's Abr.* 501.) And trespass was held to lie for entering a market and erecting a stall there, to sell meat, without the license of the owner of the soil; though the defendant had, of common right, a liberty of coming

into the market for the purpose of buying and selling. It follows, then, that to excuse the defendants, the purpose for which they entered must be lawful; that is, it must be in conformity with the rules and stipulations of the original agreement under which the two societies were formed, and with the form of government, discipline and organization according to which the land and buildings were purchased and held. If the entry of the defendants was, as it seems clearly shown it was, by a portion of the congregation, a section of the members, in order to assert and maintain a right to place a preacher of their own in the pulpit, then the question arises, was such purpose lawful? Had they a right to do so under the articles?

Here again I throw out of the question, whether Mr. Yeager was duly elected preacher or not—whether the church was then vacant or not—whether, even if he were not *de jure* preacher, he was not so *de facto*, under colour of right, and entitled to hold and be regarded as such, in consequence of his having been actually elected and inducted by the church council, the body to whom, by the articles, the authority to elect the preacher is expressly intrusted. The question is, not on the strength or weakness of Mr. Yeager's title, but on the validity of the acts of the defendants. And I am not able to perceive in these articles any authority given to a body of the members to place a preacher of their own in the pulpit. By the fourth article the trustees, in conjunction with and by the consent of the elders and wardens, have the right to elect and remove the ministers. And by the eighth article no other minister is to preach in the church, except by the consent of the regular minister and vestry, whose part it is at such a time to direct public worship. Whether, therefore, the pulpit was vacant or filled, the consent of the vestry or church council is necessary to give authority to preach; and no other person or persons can give such authority without violating the fundamental articles, and leading to confusion and distraction in the church. If one portion of the members can do so, another may. If there may be in the same society two preachers at the same time, representing different sections of the members, there may be twenty. Under these articles, it seems to me, there can be but one standing preacher of each of these congregations in that church at the same time; and that no one can be placed in the pulpit as a preacher, unless elected by the church council; or, in cases of occasional preaching, unless it is by the invitation of the actual minister and vestry: and that to place a preacher in the pulpit, not so elected or invited, is a right which no member or body of members, as such, possesses under these articles of the 5th of June, 1788, by which the property was acquired and the church organised.

It is not pretended that the preacher, Mr. Gorman, in order to place whom in the pulpit, the defendants entered, was ever elected by any church council of that church, or invited by the minister and vestry. He was invited by a body of the members, who had taken

a stand against the other members, and alleged that they were a majority of the congregation, and claimed the right to go there on the Wednesday of the week, and place in the pulpit such person as they chose to select to preach. Mr. Gorman was invited, but disappointed them, and the preaching was by Mr. Fox. I am not able to perceive any right in either to do so; or any right in the members, to force an entry into the church to enable them to preach there.

The measures taken by the defendants seem to have been pursued from a desire to contest the claims of Mr. Yeager and his friends, under the idea that he was tainted with heretical opinions. The mode pursued, however, does not appear to have been adapted to bring into question the right of Mr. Yeager to occupy the pulpit. If the church council who elected him in 1836 were unduly chosen, or acted irregularly, they should have been proceeded against by course of law. Their acts could not be reached by a collateral proceeding, much less by irregularly inviting another preacher. It may have been that the friends of Mr. Yeager acted unfaithfully in adhering to him after the trial of strength, by the advice of the synod in 1834. On the other hand, they may have had their own views respecting the character and results of that election, and may have believed that they had no better course to pursue in 1836, in the circumstances then existing, than to elect him. Certain it is, and it is agreed on all hands, that the doings of the synod, in recommending a vote by the members of the congregation, whether he should be the preacher or not, were merely of an advisary character. They could not change the mode of choosing the preacher established by the fundamental articles, nor did they pretend that they could. They indulged the hope that it would prove the means of allaying the feuds that had agitated the German Lutheran society; and it is to be regretted that their efforts failed. Still the respective parties had the right to rest upon their legal titles, and either could resort to them as the final ground they were determined to stand upon. If Mr. Yeager was an intruder, an action might have been sustained in the name of the trustees against him and those who aided him, for any illegal entry and occupation of the church; or, if the rights and privileges of any members or officers of the society were invaded, or any powers abused, the chancery jurisdiction of the Court might, under the act of 1836, have been appealed to for redress. But in the present suit the question is, not how far Mr. Yeager was duly elected or authorised, but whether the defendants had a right to enter for the purposes they did. And I am of opinion they failed to make out a justification for breaking and entering the church in June, 1837.

2. The second question is as to the right of the plaintiffs to maintain this action. The plaintiffs are the trustees to whom the legal estate was conveyed by the survivor of the original trustees and grantees in the deed of the 10th of June, 1794, from Sarah Wistar.

They therefore hold the legal estate—the religious societies merely hold, as *cestui que trusts*, the equitable right to occupy, use and enjoy the buildings and premises, for the purposes mentioned in the articles of agreement of the 5th of June, 1788. The freehold and possession of these premises passed to the plaintiffs by virtue of the deeds, and never has been displaced by any ouster since. The occupation of the *cestui que trusts* is under the possession of the trustees; it is in consistency with their title, and in subservience to it. The property is in the *cestui que trusts* for all beneficial purposes, but they do not possess the land and buildings in such a manner as to be capable of maintaining an action of trespass *quare clausum fregit* in their own names for an injury to the property, even if competent to sue as religious societies, though there may be cases where a *cestui que trust* has possession, and is then at law tenant at will to the trustees, and may sue as such. One great object of the conveyance to the trustees originally was to protect the property against intruders by suit at law. If adverse possession were taken, they would be the proper persons to bring ejectment. The rights of these *cestui que trusts* and their remedies are of an equitable kind. Then as the trustees hold the legal title and freehold for the protection and maintenance of the rights of all the *cestui que trusts*, the latter ought to have a power to use the names of the trustees at law to protect their rights. If the obstinacy or caprice of one or both the trustees can defeat this remedy, the trustees may defeat the trust at their own will and pleasure. This however is not permitted. A trustee cannot be allowed to defeat the trust: it is a breach of his duty. To be sure, if any of the *cestui que trusts* use a trustee's name, he has a right to ask indemnity against the costs from those who sue in his name. On the other hand, the damages recovered in such a suit as the present, are not for the private use of the trustees or *cestui que trusts* suing, but, after repairing any damages to the building, are for the benefit of the society injured.

These principles have been frequently recognised. Courts of chancery have very wisely considered the trustee as having the legal ownership so far only as to be beneficial to *cestui que trust*, and not subject to any advantage or disadvantage which may arise from the trustee personally as having the legal estate. *Sand. Us. and Trusts*, 191. As the trustee cannot prejudice the *cestui que trust* by *doing* what he might lawfully do, so he cannot hurt him by *omitting* to do what it was his office to perform. *Ib.* 193. 3 *P. Wms.* 215. The trustee can bring any action respecting the trust estate, the *cestui que trust*, though the absolute owner in equity, being at law regarded in the light of a stranger. *Allen* v. *Imlett*, (*Holt*, 641.) Where several trustees for the creditors of an insolvent were plaintiffs in an action at law, and one of them whose consent had not been obtained before the action was brought, gave a release to the defendant, but without any consideration, and the defendant pleaded

(Unangst *v.* Shortz.)

the release *puis darrien continuance,* the plea was set aside without costs, on the terms of an indemnity being given to him who had so released. 1 *Chitt. Rep.* 390, cited in *Willis Trust.* 207. *Cestui que trusts* may use the name of their trustees, giving them a proper indemnity. *Ib.* 222. Legatees may use the names of the executors to recover in ejectment. *Vernor* v. *Henry,* (1 *Watts,* 193.)

We think there is nothing in the objections to the evidence.

Judgment reversed, and *venire facias de novo* awarded.