## Henry *et al.* versus Deitrich *et al.*

1. Where a church congregation divides into parties and by reason of numbers and the character of the rights of the parties damages are unsuitable as a means of redress, and the case admits of no adequate remedy at law, equity alone can apply the required remedy.

2. Courts of Common Pleas in this state being invested with the powers of a court of chancery in the supervision and control of unincorporated societies, have jurisdiction of disputes between the members of unincorporated religious associations as to their rights and privileges in an estate conveyed for their use.

3. A majority of a church congregation may direct and control in church matters consistently with the laws of the organization or denomination to which it belongs, and acting within the limits and under the rules of the articles of the association the power of the majority is absolute, and the minority can assert no privilege or immunity to justify resistance to any legitimate action the majority may take.

4. A minority of the persons in an unincorporated association, in whom a trust of a church property is vested, cannot by procuring a charter of incorporation acquire the right to the management of the property in opposition to the will of the majority of those interested.

May 12th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, PAXSON, WOODWARD and STERRETT, JJ. GORDON, J., absent.

Appeal from the decree of the Court of Common Pleas of *Lancaster county :* Of May Term, 1877, No. 2. In Equity.

This was a bill in equity filed by S. S. Henry and others against Jacob Deitrich and others.

[Henry v. Deitrich.]

The case is fully stated in the opinion of this court, together with the following facts:

On the 8th day of May 1744, the proprietaries of Pennsylvania issued a warrant to Henry Haller and Peter Frey, who were then representatives of the Calvinist Reformed and the Lutheran congregations, in Cocalico township, now East Cocalico township, for a tract of land in said township, upon which the ·said congregations built a church for joint use.

On the 30th day of May 1761, Henry Haller and others, in behalf of the Calvinist Reformed congregation, and Jacob Frey, who was assignee of Peter Frey, and others, in behalf of the Lutheran congregation, entered into a written agreement that the said Calvinist Reformed congregation shall be ministered after the manner and meaning of the Heidelburg Catechism, as the same was ordered to be ministered in that church in the year 1563, and in accordance with the Holy Scriptures, and no *other doctrine or minister shall have any right whatsoever;* that the said Lutheran congregation shall be ministered after the Reformation of Dr. Luther and the true meaning of the Augsburg Confession, in accordance with the Holy Scriptures, and no *other doctrine or minister shall have any rights;* that the said church shall be repaired at the joint charge of both congregations; and that they shall have ministers every Sunday, each congregation alternating with the other.

The said congregations, on the 25th of March 1772, received a patent from the proprietaries for said tract, and they subsequently ·purchased two small tracts adjoining, making in the aggregate about eleven acres, which have always been held and used by said congregations for the purposes and in the manner provided by the said agreement of May 30th 1761, until they were disturbed by the defendants.

The said German Reformed Church being and always having been a member of ths Classis and Synod of the German Reformed Church of the United States, which is ministered after the manner and true meaning of the Heidelburg Catechism, and is within the jurisdiction and control of the Lancaster Classis, and the Rev. S. S. Sweitzer and the other plaintiffs of that church being the regularly installed minister and officers; and the said Lutheran Church being and always having been a member of the Synod of Pennsylvania of the German Evangelical Ministerium of the United States, ministered after the Reformation of Dr. Luther and the true meaning of the Augsburg Confession, and the Rev. S. S. Henry and the other plaintiffs of that church being the regularly installed minister and officers; and the said plaintiffs, thus being the representatives of the parties to the agreement of May 30th 1761, and being entitled to the *exclusive* use of the said church building on alternate Sundays, the Rev. S. S. Henry and his officers and congregation were, on the 28th day of June and 12th day of July 1874,

[Henry *v.* Deitrich.]

their regular Sundays, forcibly kept out of the church by Deitrich, Lausch and other defendants, and were by them prevented from using it, as it was their exclusive right, in accordance with the design of the founders, and the Rev. S. S. Sweitzer and his officers and congregation were notified, by Kessler, Rupp and other defendants, not to enter the church for purposes of worship, and were threatened by them with violence if they did so.

The defendants, Deitrich, Lausch and others, claiming to be Lutherans, and Kessler, Rupp and others, claiming to be German Reformed, in order to carry out their designs of forming new connections outside of the regular Lutheran and German Reformed churches, of which these congregations have always been part, and to carry the congregations and church property over to such new connections, in November 1872, and prior to the filing of the bill in this case, without the consent of the regular church organizations, or of the congregations, obtained from the Court of Common Pleas of Lancaster county, a charter, in which they provided that they should have " the right as separate congregations to call, employ and contract with such ministers and other religious persons as they may severally require." By virtue of this charter they claimed the right to exclude the plaintiffs from the church, and to hold and manage the church property for such uses as to them may seem fit.

This bill was brought, therefore, to restore the plaintiffs to their rights of worship and property, and to prevent the defendants from interfering with them.

Defendants demurred to the bill, on the ground that the plaintiffs have an adequate remedy at law.

The court sustained the demurrer and dismissed the bill, on the ground stated in the demurrer, and that the charter granted to the defendants fixes and determines the rights of the plaintiffs, and the court cannot " abrogate and annul this charter in this proceeding."

From this decree this appeal was taken.

*N. Ellmaker* and *D. G. Eshleman,* for appellants.—The court below was of opinion that preventive justice, as exercised through the courts under the penal laws, would allay all fears and prevent further injury, and that an action at law would secure to plaintiffs compensation for damages. It is submitted that only through the intervention of a court of equity, by injunction, could constantly recurring grievances, irreparable mischief and a multiplicity of suits be prevented in religious controversies of this kind, and that said court is the only forum in which to proceed to procure an adequate remedy: Commonwealth *v.* Railroad Co., 12 Harris 159; 2 Story's Eq. Jur., § 928; McArthur *v.* Kelly, 5 Ohio 140; Brunnenmeyer *v.* Buhre, 32 Ill. 83; Trustees *v.* Hoessli, 13 Wis. 348; McGinnis *v.* Watson, 5 Wright 9; Sutter *v.* Trustees, 6 Id. 503;

[Henry v. Deitrich.]

Winebrenner v. Colder, 7 Id. 244; Kisor's Appeal, 12 P. F. Smith 428; Schnorr's Appeal, 17 Id. 138; Roshi's Appeal, 19 Id. 462; McAuley's Appeal, 27 Id. 397; Trexler v. Mennig, 2 Weekly Notes 677.

*A. J. Eberly*, for appellees.—If there be an adequate remedy at law for an injury done or threatened, and the injury is not irreparable, and if compensation can be had therefor, courts of equity have no jurisdiction: Clark's Appeal, 12 P. F. Smith 450; Hagner v. Heyberger, 7 W. & S. 104; Gray v. Ohio & Pennsylvania Railroad Co., 1 Grant 412; Richards's Appeal, 7 P. F. Smith 105; Hilliard on Injunctions 471; Adams's Eq. 485; 2 Story's Eq., § 925. A decision such as prayed for by appellants would abrogate the charter of appellees.

Mr. Justice WOODWARD delivered the opinion of the court, October 1st 1877.

After a denial of some of the material allegations of the plaintiffs, the defendants concluded their answer by a general demurrer to the whole bill. All embarrassment that might have arisen in the investigation of the cause from controverted facts has thus been averted. The argument throughout has recognised the truth of the averments of the bill, and has proceeded precisely as if no answer had been filed. While the counsel for the defendants have explained that a motive so laudable as their "high regard for truth," has prompted their denial of the statements of the plaintiffs, they have still expressly acquiesced in and accepted the effect of the demurrer.

A warrant was issued out of the land office of the proprietaries of Pennsylvania on the 8th of May 1744, to Henry Haller and Peter Frey for a tract of land in the township of Cocalico, in the county of Lancaster, to be held in trust for the Calvinist Reformed and Lutheran congregations of that township, Haller being the representative of the first congregation and Frey the representative of the second. By a deed-poll dated the 16th of May 1761, Peter Frey conveyed his interest in the warrant to Jacob Frey, subject to the same trust. On the 5th of February 1762 a survey was made and the quantity of land ascertained to be nine acres and sixty perches. A patent was issued on the 25th of March 1762, to Haller and Jacob Frey and their heirs and assigns, "in trust, nevertheless, and to and for the use of the said two several congregations of Calvinists and Lutherans, for the time being, and their successors for ever, using and frequenting, and to use and frequent, the respective churches and meeting-houses erected and to be erected, from time to time, on said land, and for burial-yards for them respectively, in such manner as the majority of each of the said congregations respectively shall, from time to

3 NORRIS—19

[Henry *v.* Deitrich.]

time, order, direct and appoint, and to and for no other use or purpose whatsoever." On the 30th of May 1761, in the interval between the execution of the deed-poll and the location of the warrant, Henry Haller and three other persons, as elders and trustees of the Calvinist Reformed congregation, entered into articles of agreement with Jacob Frey and three others, as elders and trustees of the Lutheran congregation, by which, after reciting the warrant from the proprietaries and the joint erection of a common church on the land granted, it was stipulated that Haller and his co-trustees, and their successors for ever, should have the right to use the property for the purposes of the Calvinistic Reformed congregation, which was to be "ministered after the manner and true meaning of the Heidelberg Catechism;" that Frey and his co-trustees, and their successors for ever, should have the right to use the property for the purposes of the Lutheran congregation, to be "ministered after the Reformation of Dr. Luther and the true meaning of the Augsburg Confession;" that the two congregations should be jointly chargeable with the cost of buildings and repairs; that if both should provide for church services on the same Sunday, the hours for the services of each should be peaceably arranged; that the privileges of each in the occupancy of the property should be equal; and that the patent for the land should be granted on these terms. From 1761 to this time, the two churches have maintained their organizations, elected their officers and called their ministers. The plaintiffs are the ministers, trustees, elders and deacons of the two congregations, elected in due and regular succession, in pursuance of the ancient instrument by which the uses of their property were defined. Two small tracts, adjoining that for which the patent issued in 1762, have been since purchased and dedicated to the same purposes. The quantity of land now held is about eleven acres.

In October 1872, Daniel Kessler and others, claiming to be officers and members of the Reformed congregation, and Joseph Zerber and others, claiming to be officers and members of the Lutheran congregation, obtained a charter of incorporation by a decree of the Court of Common Pleas of Lancaster, under the title of "The Independent Associate German Reformed and German Lutheran Muddy Creek Church of East Cocalico Township." The fourth article declared: "Each congregation, though the two by this charter form but one congregation, shall continue to have the right to hold whatever property they now have, own and possess, as heretofore, and to take and receive bequests, donations and legacies, as individual congregations; to have the right, as separate congregations, to call and employ such ministers and other persons as they may severally require, and to order and provide, by their by-laws, rules and regulations, how disputes and difficulties are to be arranged, settled and compromised, that may arise between the

[Henry v. Deitrich.]

two separate and, for many purposes, distinct congregations, and how each congregation is to contribute towards the payment of the expenses in keeping the common property in repair." Under the charter, which was procured without the concurrence of the plaintiffs, the defendants assert the right to control the organization of the two churches, and to take exclusive possession of their land and buildings. It is alleged in the bill that those of them who are Lutherans, by force and threats, prevented the use by the Lutheran plaintiffs of the church for the usual services on Sunday, the 28th of June, and on Sunday, the 12th of July 1874; and that the German Reformed defendants have threatened forcibly and violently to prevent its use by the plaintiffs, who represent the German Reformed congregation. This bill for an injunction was dismissed by the court below, because the decree incorporating the defendants could not be overturned in a collateral proceeding, and because the plaintiffs had adequate remedies at law.

In the consideration of this cause, the first question that presents itself is whether or not the jurisdiction of a court of equity was properly invoked. It is clear upon ample authority that the original articles of agreement created a charitable use, to which the legal title derived from the warrant, survey and patent became subservient. The English statute of 43 Elizabeth never was in force in Pennsylvania, but its principles have constantly been applied here by common usage and under constitutional recognition: Brightly's Eq., § 398. "We consider," Chief Justice GIBSON said, in Witman v. Lex, 17 S. & R. 91, "the principles which chancery has adopted in their application to particular cases, as obtaining here, not indeed by force of the statute, but as part of the common law; and where the object is defined, and we are not restrained by the inadequacy of the instrument which we are compelled to employ, we give relief nearly, if not altogether, to that extent which chancery does in England." The rules deducible from the English chancery precedents for the construction of the statute of Elizabeth, may be safely trusted, therefore, to illustrate questions which arise in the current practice of our own courts. In The Attorney General v. Heelis, 2 Sim. & Stu. 67, one of those rules was stated by the vice-chancellor to be that "funds supplied from the gift of the crown, or from the legislature, or from private gift for a legal, general and public purpose, are charitable funds to be administered by courts of equity." And this rule has been adopted in this state to its full extent. Thus, in Unangst v. Shortz, 5 Whart. 506, which was a contest amongst persons claiming as members of the German Lutheran and German Reformed congregations of the Dry Lands, under articles of agreement by which the rights of the congregations, and the privileges, powers and duties of their officers and members, were prescribed, Mr. Justice SERGEANT said: "The articles of agreement form the fun-

[Henry *v*. Deitrich.]

damental rules and regulations, and are in the nature of a consti-
tution, under which the congregations jointly and severally enjoy
certain temporal and religious rights. This mode of holding real
estate in trust for religious societies and others of a charitable na-
ture, was frequently adopted in Pennsylvania when it was a pro-
vince, instead of a charter of incorporation. They are not incor-
porated bodies in the proper sense of the term, but resemble them
in this, that their trusts are of a public character, and are specially
provided for by the laws and constitution of the Commonwealth."
The Methodist Church *v*. Remington, 1 Watts 218, affirmed the
decision in Witman *v*. Lex, *supra*, that a trust in favor of an unin-
corporated religious or charitable society is an available one. And
the court remarked in the same case that " equitable powers in sup-
port of charitable uses seem to be founded in necessity and the
constitution of the court, rather than in the provisions of the sta-
tute of Elizabeth." The courts of common pleas, by statutory
enactment, have the jurisdiction and powers of a court of chancery
in " the supervision and control of all corporations, other than those
of a municipal character, and unincorporated societies or associa-
tions, and partnerships." This controversy relates to the rights,
privileges and property of two unincorporated religious societies,
and jurisdiction in the court below, in a proper case for its inter-
vention, would be unquestionable. If it had not jurisdiction, it
was necessarily for reasons resting in the nature of the controversy
itself.

Large numbers of individuals were connected with each of these
congregations. The contest between the parties to the record
related to powers and privileges in which all those individuals were
entitled to participate. If they had desired it, they could have
demanded a hearing and have been heard. To them damages which
might be recovered by the plaintiffs would afford not only no ade-
quate remedy, but no remedy at all. A resort to the criminal pro-
cess of surety of the peace would be equally inadequate, and would
produce scandalous and unseemly conflicts. Religious societies are
entitled to a more appropriate legal protection of their secular and
spiritual interests than would consist in the power to appeal to a
criminal court or a justice of the peace. Here, as in Kisor's Ap-
peal, 12 P. F. Smith 428, " by reason of numbers, and of the char-
acter of the rights of the parties, damages are unsuitable as a means
of redress, and the case admits of no adequate relief at law. Equity
alone can apply the required remedy, while the malcontents can
be restrained only by the powers of a chancellor." In the same
case, the remark of Chief Justice Lowrie, in Kerr *v*. Trego, 11
Wright 296, was quoted, that a bill in equity "is the very rem-
edy usually adopted when churches divide into parties, and we
applied it in three such cases in the last year." In the words of
Mr. Justice Sharswood, in Roshi's Appeal, 19 P. F. Smith 462,

[Henry v. Deitrich.]

" a religious society, incorporated or unincorporated, is but the trustee of a charity, and it has always been peculiarly within the province and duty of a court of equity to prevent the diversion of property held in trust for such purposes from the object and design of the original endowment." The rights of one of these congregations have been invaded by the exercise of actual force, and those of the other are held subject to the threat that they will be subverted by the future violent action of the defendants. And the acts done and the acts threatened are proposed to be justified by an alleged title to the whole common property derived from the charter of incorporation. The defendants have set up no other ground of claim, and the validity of that the plaintiffs have earnestly and persistently denied. It cannot be possible that any system of jurisprudence would leave a body of Christian people in a peaceable community in terror. every Sunday of outbreak and outrage in a Christian church. An adjustment of the differences between these parties is necessary, no less for the public interest than for the welfare and prosperity of the two congregations. And the adjustment can be effectual only in the form of remedy the plaintiffs have adopted. It can extend to every question at issue, and can define all rights, whether individual or congregate, that are involved. Its adaptation is all the more complete because its determination will prevent a series of disgraceful wrangles before a magistrate and in the Quarter Sessions, and of protracted lawsuits in the Common Pleas, prosecuted with the proverbial bitterness of church disputes.

Confessedly, the plaintiffs are representatives of the majority of the members of both the churches. By the terms of the patent, the land granted and the buildings to be erected on it were to be used and frequented " in such manner as the majority of each of the said congregations should from time order, direct and appoint." It has not been alleged that there has been any departure from the rules and usages of the denominations to which they respectively belong. In simple truth, the one element of disturbance has been the existence of a dissatisfied and restive minority in each church. While the general principle of law is that in private associations the majority cannot bind the minority except by special agreement, yet the principle is equally general that where the power is of a public nature, the majority shall govern, because it is for the public good, and the power is to be more favorably expounded than when it is for private purposes : Attorney-General v. Davy, 2 Atk. 212; Withnell v. Gartham, 6 Term R. 388; Livingston v. Lynch, 4 Johns. Ch. 573. A majority of a church congregation may direct and control in church matters consistently with the particular and general laws of the organism or denomination to which it belongs : Sutter v. Trustees of the First Reformed Dutch Church, 6 Wright 503. Acting within the limits and under the rules of the original articles of association, the power of the majority of the members of

[Henry *v*. Deitrich.]

each of these congregations is absolute. The officers elected by them can alone exercise the authority conferred on the first trustees, and a minority can assert no privilege or immunity to justify resistance to any legitimate action the majority may take.

But the defendants rely on their charter. If the effect claimed for it were necessarily to be conceded, the most easily contrived and most flexible possible machinery would have been invented for the creation of church organizations and the acquisition of church property. The petitioners for incorporation styled themselves officers and members of the congregations. But they were outside all regular and legal congregational action. As officers they had never been elected in any duly prescribed form or by any qualified constituency. They represented no interests entitled to representation. The act of the court neither created nor transferred title to property or to ecclesiastical authority and jurisdiction. Conceding that the court's exercise of the legislative power vested in it, was equivalent to the direct exercise of that power by the legislature itself, yet an Act of Assembly could not have shifted the title derived from the articles of 1761 from the plaintiffs to the defendants. It was settled in the Commonwealth *v*. Jarrett, 7 S. & R. 460, that a minority of the persons in whom a trust of a schoolhouse and a school was vested, could not by associating and procuring a charter of incorporation under the Act of April 1791, acquire the right to the management of them in opposition to the will of the majority of those interested. It is not proposed to overturn or otherwise interfere with any legitimate powers of the defendants as corporators. No inquiry into the validity of the charter would be possible in this collateral proceeding. But under it the defendants claim the franchise to control the temporal and spiritual concerns of these churches. The Act of the 19th of June 1871, Pamph. L. 1360, makes it the duty of this court to inquire whether the franchise claimed is actually possessed: Edgewood Railroad Co.'s Appeal, 29 P. F. Smith 257. The power to manage the churches and their property has descended to the officers who have been duly chosen. The charter may be useful somewhere, but it has no place here. Whatever its value and in whatever direction the franchises it has conferred may be exercised, it is mere waste-paper, and its place would be more appropriate in a waste-basket than among the files of a court of justice, so far as its provisions relate to the organization, the land, or the church building of these congregations.

The decree of the Court of Common Pleas is reversed, and it is now ordered, adjudged and decreed that a writ of injunction be forthwith issued out of the said court to be directed to Jacob Deitrich, Henry Lausch, Jacob Lausch, Samuel Frey, Joel Brossman, Michael Smith, John Zerber, Isaac Zerber, Jacob Garner, Daniel

[Henry v. Deitrich.]

Kessler, Sr., Henry Rupp, Martin Lorah, William Rupp and Samuel Pennybecker, to restrain and enjoin them and each of them, their aiders and abettors, from interfering with or in any way preventing the plaintiffs and their successors, regularly elected and installed, from entering the Muddy Creek church at such times as they may see fit, for the purpose of worshipping therein in accordance with the articles of agreement of the 30th of May 1761, and with the rules and regulations of the German Reformed and Lutheran churches; and it is further ordered, adjudged and decreed that all costs in this cause accruing and incurred in the Court of Common Pleas and in this court be paid by the said defendants.