# Skilton et al. *v.* Webster et al.

[JANUARY 11, 1851.]

A court of equity will entertain jurisdiction to compel the trustees of a church to permit clergymen who adhere to the principles of the church, with which they are in connexion, to minister to the congregation in the church edifice, and to appropriate the profits to the support of such ministry, without regard to the comparative numbers of the respective parties in the congregation.

It is not sufficient, to oust the jurisdiction of a court of equity, that the complainant has a remedy at law; unless that remedy be full, complete and adequate.

The decisions of ecclesiastical tribunals, in all cases on doctrine, order and discipline, are conclusive in the common law courts.

When it appears that property is dedicated to support peculiar tenets, but not to support such tenets in connexion with a particular church government, then it is not subject to any ecclesiastical power which upholds those tenets.

Where property is dedicated to support peculiar tenets, *primâ facie*, it is subject to the jurisdiction of the ecclesiastical courts; and if the parties wish exemption from their jurisdiction, it is necessary for them to show clearly that such was the intention of the founders of the church; particularly, as applied to a presbyterian church.

Extraneous evidence and circumstances may be resorted to, in aid of a doubtful construction, but it cannot be legitimately used to control the obvious meaning of the language which parties have chosen to employ.

It is one of the fundamental principles of all presbyterian churches, that presbyterian church government is a divine institution.

A dedication of property for the use of a congregation who should adhere to the religious principles agreed to at Pequa, in 1784, is subject to the jurisdiction of the ecclesiastical courts of the associate presbyterian church.

The right of secession is an inherent and distinctive principle of the associate church.

In case of secession, the minority of the church are not entitled to any portion of the property, although they may be numerically the majority of a particular congregation, and remain in possession.

The associate church does not recognise so absurd a principle, as that any members at their mere will and pleasure have the right to secede from the majority, and by such act, to become, or continue to be, the true associate church, and to take with them the particular property of which the separating minority may happen at the time to have the possession, and to hold it against the will of, and to the exclusion of the majority.

[ Skilton v. Webster. ]

THIS was a bill in equity filed by Robert Skilton and others, members of the church incorporated (on the 10th of May, 1802,) as "The Associate Congregation in the City of Philadelphia," and known as the First Associate Presbyterian Church of Philadelphia, in the state of Pennsylvania, adhering to the religious principles of the associate presbytery of Philadelphia, formerly, now the associate synod of North America, for themselves and all other members of the said church and congregation, who adhere to the standards thereof; against the trustees of the said corporation, certain ruling elders thereof, the Rev. Chauncey Webster, claiming to be its pastor, and the corporation itself.

The bill set forth that about the year 1754, a denomination of Christians was organized as a church in Pennsylvania, called "The Associate Church of North America," under the superintendence of the associate synod of Scotland; and, about the same time, the several congregations in this state, by the authority of said synod, constituted a presbytery, styled "The Associate Presbytery of Pennsylvania." That the congregations of said church having largely increased, the said associate presbytery was divided, one of the said divisions being the associate presbytery of Philadelphia; and other presbyteries, from time to time, were added, the number at present being fourteen. And that in the year 1801, a synod was duly constituted and organized by said associate church, as the visible head and supreme judicatory of said church in North America, and styled "The Associate Synod of North America," to which all the presbyteries and congregations owe obedience; and all ecclesiastical subordination to the associate synod in Scotland was abolished about the year 1817.

That about the year 1790, in the city of Philadelphia, certain persons professing the principles of the associate church, as set forth in the books hereinafter mentioned,

[Skilton *v.* Webster.]

were duly organized as a congregation, under and subordinate to the said associate presbytery of Pennsylvania, and called the associate presbyterian church; and since the year 1801 said congregation has belonged to and formed part of the associate presbytery of Philadelphia.

That the term "congregation," in the associate church, means members of a local church in full communion, and their children.

That the established judicatories of the associate church are sessions, presbyteries, and a synod. That an appeal lies from the session to the presbytery, and from the latter to the synod. That the session consists of the minister and ruling elders of a congregation. It has the general management of the spiritual government of the congregation, but has no authority to place a minister over it, of its own mere will. A presbytery consists of all the ministers within a given district, and of one ruling elder from each pastoral charge. It has, among other things, the power of ordaining, installing, and removing ministers within its bounds; of trying, convicting, and punishing ministers, by suspension, deposition, excommunication, or other censures of the church—of visiting congregations—and generally of ordering whatever belongs to the spiritual welfare of the churches under its jurisdiction. The synod is the supreme judicatory, consisting of all the ministers, or of a delegation, from each presbytery, and of a ruling elder from each pastoral charge. It has the power, among other things, to decide upon appeals from the presbyteries—to redress any act of theirs contrary to order—to judge in controversies respecting doctrine and discipline—to bear testimony judicially against error in doctrine or immorality in practice—to declare the office of any minister vacant upon affirming the act of any presbytery deposing such minister—and generally to take care that inferior courts act in conformity with the word of God, and the standards of the said church.

That the associate synod of North America is the

[Skilton *v.* Webster.]

supreme judicatory of the associate church in North America, and its decisions are final and obligatory.

That there is a sentence of suspension used by the judicatories of the said church for the discipline thereof, which may be either for a limited time, or indefinite, and may be inflicted either upon private members or officers, and in respect of the latter, it is a judicial exclusion from the exercise of office and from sealing ordinances.

That in the year 1784, the associate church of North America adopted and published a particular statement of their principles, in a book called and known as "The Declaration and Testimony of the Associate Church of North America." It was set forth and agreed to at Pequa, on the 25th day of August, 1784. These principles require, among other things, every member admitted to communion to declare and profess adherence to the Westminster confession of faith, the form of presbyterial church government, &c., as these are received and witnessed for by the associate church in her said declaration and testimony; and every officer, whether minister or elder, vows, at ordination, to avoid every divisive course, and to submit himself to the church courts, and every minister promises to be submissive to the presbytery, as subordinate to the associate synod of North America. These principles are now the principles of said associate church.

That in the year 1802, William Marshall, and others, then members of said associate presbyterian church of Philadelphia, and citizens of the commonwealth, applied for and received a charter of incorporation from Pennsylvania, for themselves and such others as should thereafter become members of said congregation being such citizens, and adhering to the religious principles expressed in the before mentioned declaration and testimony, agreed to at Pequa, as aforesaid, by the name, style, and title of "The Associate Congregation in the city of Philadelphia," with the usual privileges of such bodies politic. That before and

[Skilton v. Webster.]

since the said incorporation the temporalities of the said congregation were committed to the care of a board of six trustees, two of whom are elected annually, on the first day of each year, by the pew-holders in said church.

That subsequently to the organization of said church in Philadelphia, viz., on or about the 24th day of August, 1790, David Clark and William Young, both members of said congregation, purchased, for the use of the same, a lot of ground on the north side of Walnut street, between Fourth and Fifth streets, being 36 feet 10½ inches wide, by 124 feet deep—and shortly afterwards there was erected on part of said lot a brick house, for the public worship of God, which was paid for out of the funds of said congregation, and the residue of the lot was appropriated for a burying ground; and a perpetual trust was declared of and concerning the said house of worship and burying ground, as follows, viz., "that the said church and lot of ground are held in trust for the associate congregation in the city of Philadelphia, who adhere to the religious principles expressed in a declaration and testimony for the doctrine and order of the church of Christ, agreed to at Pequa, the 25th of August, 1784, by the associate presbytery of Pennsylvania. That the said congregation may assemble in the said church for public worship, from time to time, for ever, and use the said burying ground for interring their dead."

That on the 2d day of August, 1802, John Cummings did sell and convey unto the said corporation in fee, two lots of ground on the west side of Thirteenth street, south of Spruce street, as an additional burying ground for the use of said congregation—that the lot on which the house of worship is erected is worth about $15,000—the additional burying ground about $3,000—and that the furniture and fixtures of the church are worth about $500—and that the whole of said property is held in trust for the sole and exclusive purpose of being devoted to the support of teaching and preaching the gospel, and the administration of divine

[ Skilton *v.* Webster. ]

ordinances in said associate congregation according to the aforesaid principles of faith and practice, discipline and government of said associate church of North America.

That according to said principles no minister under sentence of suspension is permitted to occupy the pulpit, or administer divine ordinances, in a congregation of said associate church, nor can any member thereof attend on the ministry of such suspended minister without violating his own vows. That by said rules and principles the trustees of a congregation have no authority to call or in any way procure a minister to preach or officiate therein. That a clergyman can only be called to the office of pastor by a call, signed by the elders and members of the congregation who are in full communion, addressed to the individual called, and presented to the presbytery to which said clergyman belongs—if the presbytery approve, the minister is ordained and installed by the presbytery—if this body disapprove, the person called cannot become pastor of the congregation. A temporary supply is granted by the presbytery upon the petition of the elders of the congregation.

The bill further states that in the year 1837, the said first associate congregation of Philadelphia called the Rev. Chauncey Webster, one of the defendants, to be their pastor, by a written document, in the usual form, and which set forth that the members of said congregation had acceded to the principles of the associate presbytery of Philadelphia, as subordinate to the associate synod of North America. That said call was delivered to and accepted by said Webster, through the said associate presbytery—and due proceedings being had, the said Webster was ordained and installed as pastor of said congregation, and thereupon vowed, among other things, to submit himself to the admonitions of said presbytery, as subordinate to the synod aforesaid—to maintain the unity and peace of the church, and to avoid every divisive course.

[ Skilton *v.* Webster.]

That said Webster continued to be pastor of said congregation, until the said presbytery, at a meeting duly convened at Carlisle, on the 8th day of October, 1845, adopted, in due form, and according to the discipline of said church, a libel against him for a series of misconduct on his part, viz., defamation, slander, divisive courses, contempt of authority, and falsehood. A copy thereof was duly placed in his hands, and he was cited to appear and answer the same at a meeting directed to be held in Philadelphia, in the session room of the church of which he was pastor, on the 2d Wednesday of November following, viz., the 12th. That prior to said meeting, viz., on November 11th, 1845, the said Webster did, in an open and public manner, decline the authority of said presbytery and synod, and deny them to be his lawful judges—and did, in conjunction with F. W. M'Naughton, and one or two others, at the session room aforesaid, assume to constitute themselves into the associate presbytery of Philadelphia, and excluded the presbytery from said session room. Whereupon said presbytery, in pursuance of its powers, and in accordance with the principles and discipline of said church, did suspend said Webster (in order to his trial) from the exercise of his ministry, and from the communion of said church, until he should give evidence of repentance; and he was duly cited to appear at the bar of said presbytery on the 3d Wednesday of December following, to answer for his said disorderly conduct, and also to answer said libel. Failing to appear at that time, although duly notified, said Webster was again cited to appear and answer as aforesaid on the 27th day of May, 1846, with notice that unless he did then appear, the presbytery would proceed to try his case as if he were present. Accordingly at said time, said Webster still declining to appear before said presbytery, that body proceeded to the consideration of the said charges against him, and in due course, found him guilty thereof, and proceeded to and did pass upon him sentence

[ Skilton *v.* Webster. ]

of suspension from the exercise of the office of the gospel ministry and from the communion of the associate church.

That when said Webster, M'Naughton, and others, did assume, in such disorderly manner, in the session room of said first associate church, to constitute themselves into the associate presbytery of Philadelphia, certain of the complainants, being present, did, for themselves and other members of said congregation, protest against said act, and did subsequently present their protest to the presbytery —which said body did legally and canonically adjudge and recognise the said protesters as the first associate congregation of Philadelphia. And the said associate synod of North America did afterwards, at a meeting duly held at Philadelphia, on the 6th day of June, 1846, upon consideration of said protest, which had been duly transmitted from said presbytery, legally and canonically adjudge that the said protesters, including the complainants, should be recognised as the true first associate congregation of Philadelphia, adhering to the principles of the declaration and testimony adopted at Pequa. And they are so recognised by the said presbytery and synod at present; and they aver that they are properly said congregation.

That the said Webster has not, at any time since his said suspension and excommunication, made submission to said presbytery, nor given evidence of his repentance, but has persisted and still does persist in exercising the office of pastor of said congregation, in defiance of the authority of said presbytery and synod, and that others of the defendants, M'Gonegal, Oliver Skilton, Donnelly, Auld, Totten, and Smith, trustees of said congregation, although duly notified of the premises, have permitted and do permit said Webster to occupy the pulpit, and officiate as pastor and minister of and in said church edifice, and sustain and uphold him therein, and have rented and otherwise appropriated the pews in said edifice to the exclusion of the complainants and others who adhere to the said presbytery and

[Skilton *v.* Webster.]

synod, and claim to and do control all the property of said congregation, and have diverted it from its proper purposes by appropriating it to the support of said Webster, and of his ministrations as pastor, notwithstanding his suspension and excommunication, and to the use of themselves and others who do not adhere to the faith and discipline of said associate church. And the said trustees exclude clergymen from such church edifice who are in regular standing and full communion with said presbytery and synod, and also exclude the complainants unless they will consent to attend upon the ministry of said suspended and excommunicated minister.

All of which acts the complainants alleged to be contrary to the duty and trust as declared by the foregoing declaration of trust and deeds, and intended by the founders of said church, and contrary to the principles of the faith and practice, discipline and government of the said associate church, and to be to the injury of the complainants and others who are members of the said congregation, and adhere to the principles and standards of their church.

The bill stated the refusal of the defendants, after request, to perform their duty and trust, and after the interrogatory part, prayed for relief as follows,—that the defendants may be compelled to permit clergymen in full communion with said presbytery and synod, and who adhere to the principles and practice of the said associate church, to minister to the said congregation in said church edifice—that the trustees may be compelled to appropriate the property to the support of such ministry and none other,—that the trustees and said Webster may be compelled to account for the property since the time of his suspension—that the said trustees may be removed from office for their breach of trust, and others appointed in their stead, and that the books, papers, records, and property of said congregation be delivered to such new trustees—that said Webster may be restrained and enjoined from officiating in any way as

[ Skilton *v.* Webster. ]

minister in said congregation, or from intermeddling with the spiritualities or temporalities thereof—and that the trustees and ruling elders be also restrained and enjoined from permitting the said Webster so to do—and from appropriating said property in any other way than for the support of a minister in regular standing and full communion as aforesaid, and settled according to the principles and practices of the associate church—and finally, from interfering with the occupation of said church edifice by the complainants and other members of the congregation who adhere to the said presbytery and synod, in order to the administration therein of divine ordinances according to the faith and discipline of the associate church.

The bill also contained a prayer for general relief, and for a subpœna and writ of injunction.

The answer denied that the complainants, or any of them, were, at the time of filing of the bill, members of the church or of the corporation called "The Associate Congregation in the city of Philadelphia," and proceeded to give an historical sketch of the associate church. That it was originally constituted in Scotland, in 1733, by four ministers who seceded from the church of Scotland, and constituted "The Associate Presbytery." In 1735, this presbytery issued its judicial testimony, and is averred not to have seceded from the doctrines or standards of the church of Scotland; and the fundamental principle of said secession, and one which the respondents hold, is stated to be, that whenever the majority depart from the established standards, either in doctrine or administration, or deny the liberty of bearing open testimony against prevailing errors, it is the duty of the minority to secede, and by so doing the seceders become the true church.

That in 1744, the associate synod was constituted in Scotland. In 1747, a division took place therein in reference to the burgess oath, and that portion of the synod, being the minority, and called the anti-burghers, withdrew,

[ Skilton v. Webster. ]

and constituted themselves the associate synod. In 1788, this synod was divided into two synods, in subordination to one judicatory, called "The General Associate Synod." That in 1754, the associate presbytery of Pennsylvania was constituted, in subordination to the anti-burgher or associate synod of Scotland; and in 1788, this subordination was defined by the Scottish synod as no more than a spiritual union.

That in 1782, an attempt was made by the majority of the associate presbytery of Pennsylvania to unite with another ecclesiastical body, called "The Reformed Presbytery." The minority, consisting of two ministerial members, Messrs. Marshall and Clarkson, protested and appealed to the associate synod in Scotland, but the presbytery rejected their protest and appeal. Thereupon the minority withdrew, and organized themselves as the associate presbytery of Pennsylvania; and Mr. Marshall and his adherents formed the associate congregation in the city of Philadelphia, and became a component part of said presbytery. "The Associate Reformed Synod," about 1820 or 1822, became divided into three distinct synods, called "The Associate Reformed Synod of the South," "The Associate Reformed Synod of the West," and "The Associate Reformed Synod of the North." The associate reformed synod censured Messrs. Marshall and Clarkson; a majority of Mr. Marshall's church session opposed him, while a majority of the congregation adhered to him. A contest took place respecting the possession of Marshall's church in Spruce street, and a recourse was had to the legal tribunals, which decided against him and his adherents.

That the associate congregation in Philadelphia was afterwards formed with a view of not being subordinate to any ecclesiastical court whatever—and so that its property should not be affected by any ecclesiastical censure or decision. That its property is held in trust—and the congregation is the only *cestui que trust*, and the only corporate body.

[ Skilton *v.* Webster. ]

The answer further stated, that the associate synod in Scotland sustained the protest and appeal of Rev. Messrs. Marshall and Clarkson, and recognised them as the associate presbytery of Pennsylvania, and sent ministers to their aid, who, together with said Marshall and Clarkson, having met in presbytery, adopted at Pequa, August 25th, 1784, the "Declaration and Testimony," and declared their adherence to the whole doctrine of the Westminster confession, which was re-adopted by the associate presbytery of Pennsylvania in 1792. That attempts were made about the years 1820 and 1822, unsuccessfully, by some to unite the associate synod of North America with one or more of the associate reformed synods, but such attempts were finally condemned by the former. That in 1788, the general associate synod in Scotland adopted certain articles defining their ecclesiastical relations with the associate presbytery of Pennsylvania, and stating that causes about the profession of the faith should be brought from the latter to the former by reference or appeal. That the associate presbytery of Pennsylvania, in November, 1788, ratified these articles. That the union so defined continues to the present time, being in the nature of the mutual subordination of two equal bodies, in full communion, both being in possession of co-ordinate powers, and members of either having the right of appeal to the other.

That in 1776, the associate presbytery of Pennsylvania was divided into two, that of Pennsylvania, and that of New York; the latter adhered to the associate reformed synod. In 1801, the associate presbytery of Pennsylvania was divided into several separate presbyteries, and constituted a synod, viz. the associate synod of North America; and the associate presbytery of Pennsylvania became the associate presbytery of Philadelphia. That, in 1804, the general associate synod in Scotland enacted a new testimony as a term of communion, whereupon four ministers seceded, and on August 28, 1806, formed "The Con-

stitutional Associate Presbytery," and the general synod excommunicated them. In 1817, the associate synod of North America transmitted to the general associate synod in Scotland, a protest and appeal, by some of their members, against the adoption of the book of discipline, but no action was taken by the Scotch synod thereupon. In 1820 or 1821, the said general associate synod in Scotland formed a union with the burghers or associate synod, and the united body took the title of "The United Secession Church." Against this union there was a protest, and nine of the protesting ministers constituted themselves the "Associate Synod," and referred their case to the associate synod of North America for its approval. In 1826 and 1827 this latter synod recognised the said nine protesters as the associate synod, (in Scotland) as in connexion with, and as constituting one church with them. In 1827, the said Scottish synod united with the before mentioned constitutional associate presbytery, and formed "The Associate Synod of Original Seceders." In 1832, the associate synod of North America recognised the said "Original Seceders" as in full fellowship with them, on the ground of the union as defined in 1788, and in 1835, 1839 and 1840, reaffirmed that decision.

That the associate synod of North America, on various occasions, from 1784 to 1844, testified against the associate reformed synod.

In the latter year, a majority agreed to an alteration of the Westminster confession, in order to effect a union with the associate reformed synods. Against this proceeding, the associate congregation in Philadelphia remonstrated and protested at the annual meeting held January 1, 1845; and the associate presbytery of Philadelphia did also, on April 16, 1845, remonstrate to said synod against its said act. The said synod, notwithstanding these remonstrances, at a meeting at Xenia, Ohio, in 1845, adopted and sent down to the presbyteries and sessions for adop-

[ Skilton *v.* Webster. ]

tion, a basis of union with the associate reformed synod, which abandoned the doctrine of the Westminster confession, as received at Pequa, in 1784. In May, 1846, it re-affirmed this illegal measure, and in September, 1846, through its delegates in convention, did the same. In October, 1845, the associate presbytery of Philadelphia transmitted this basis of union to the sessions for adoption. The basis came before the session of the associate congregation of Philadelphia on the 3d of November, 1845, when they, with great unanimity, including complainants, formally seceded from, and declined the authority of the said presbytery and synod, and adopted a declaration and testimony against their said illegal acts. Others united with respondents, and on the 11th November, 1845, these constituted themselves " The Associate Presbytery of Philadelphia," and as such now claim and exercise all ecclesiastical jurisdiction over the respondents. The respondents have no other supreme judicatory in this country. The associate synod of original seceders in Scotland, in August, 1845, disapproved of the conduct of the associate synod of North America, and the respondents have referred their case to that synod, agreeably to the articles of 1788. The said associate congregation, at its annual meeting in January, 1846, at which meeting complainants were present, fully approved of the acts of respondents, and they allege that they have a perfect right to select their own pastor.

That there are now three supreme ecclesiastical judicatories in the associate church of North America — two calling themselves the associate synod of North America. One of these being formed out of the so called presbyteries of Vermont, Cambridge, and Albany. That the associate synod of North America, formed in 1801, continued the supreme judicatory no longer than while it adhered to the principles adopted at Pequa, and remained in union with the associate synod in Scotland. But it can never be the

[ Skilton *v.* Webster. ]

supreme judicatory of any portion of said church which shall have seceded for any actual or supposed defection from the doctrines or standards of the church.

That the term "congregation," as applied to the respondents, means all who worship with them, whether in full communion or not, and by the charter means those paying an annual sum for pew-rent, under certain limitations. The congregation acts through its trustees, the church through its session. The judicatories of the associate church can have no authority over the temporalities of any congregation; and only, in spiritual matters, over those who continue voluntarily to recognise their jurisdiction. The associate synod of North America continued to be the supreme judicatory only till 1841, or, at farthest, till 1844. A sentence of suspension has no effect upon those who secede because of a departure by the majority, in the opinion of the minority, from the doctrine of the church. Such secession is perfectly lawful. The respondents allege that they adhere to the principles of the declaration and testimony adopted at Pequa, in 1784. That the property of the congregation is to be disposed of according to the charter. That a minister under sentence of suspension may, by the principles of the declaration and testimony, lawfully minister in a congregation of the associate church, and can be lawfully called to the office of pastor in any other branch or party of said church, provided he is in good standing and full communion in that branch. That respondent, Webster, is in good standing and full communion with the before mentioned the associate presbytery of Philadelphia, to which the congregation adheres.

The respondents referred to the first two and the fifth of the formula of questions at ordination in support of their views. They alleged that said Webster was the pastor of said congregation, and had never been suspended according to the doctrine and order of the church, as adopted at Pe-

P

[ Skilton *v.* Webster. ]

qua. That not the presbytery, but a party, adopted the libel against him at Carlisle, in violation of the discipline of the church. That the proceeding arose out of certain publications which he had made in consequence of the conduct of the synod in 1844. That, however technical the proceedings may have been, they were an abandonment of the principles of the church; being founded upon his writings against the acts of the synod, which asserted opinions in accordance with the former declarations of the presbytery. That in the subsequent declinature and secession, said Webster acted as the organ of the session, and did not himself cause or advise the session room to be closed against the presbytery. That said Webster and McNaughton did, lawfully and according to the established order of the associate church, on the 11th November, 1845, constitute the associate presbytery of Philadelphia. That no one of the complainants then protested, although R. Skilton, one of them, did attempt to disturb the religious meeting on the evening of that day. That the complainants could not be the congregation aforesaid, whether recognised by the synod or not, as they had either withdrawn from or been suspended from communion in said church, and that there were not among them two ruling elders, which number is always necessary to form a congregation. That by professing to suspend said Webster the opposing party fully confirmed and ratified his secession, and all proceedings against him thereafter were null and void. That the trustees have neither prohibited nor permitted the said Webster to officiate as pastor, having no authority, by the charter, in the matter—their duty being simply to hold and apply the property for the use of such as adhere to the religious principles adopted at Pequa; which principles the respondents hold. That the treasurer, Smith, and secretary, Totten, have charge of the books and papers respecting the temporalities of the congregation, but not of the spiritualities. Said corporation has paid, since

[Skilton *v.* Webster.]

1837, and continues to pay, the salary of the said Webster, as originally stipulated for.

That the trustees would consider it their duty to decline letting any clergyman have the house who is not in communion with the associate presbytery to which said church belongs, such course being in accordance with the wishes of the congregation. They consider that the orderly members of the church have an inalienable right to choose a pastor for themselves. That said Webster is neither a suspended, deposed, nor excommunicated minister.

And, finally, that the whole matter in controversy between what the respondents consider "The Associate Presbytery of Philadelphia," on the one side, and the said associate synod on the other, is still pending before and awaiting the final decision of the associate synod of original seceders in Scotland.

The defendants, O. Skilton and Donnelly, filed a separate and similar answer, with the exception of omitting the averments that the complainants took part and concurred in the annual meeting of January 1, 1846—that said Webster did not cause or advise the session room to be closed against the presbytery—that he exercises the office of pastor to the great satisfaction of the congregation—and excepting also any approving reference to the so called associate synod, organized in 1841—and the assertion that the presbytery to which respondents profess to belong is the supreme judicatory in this country.

The cause was at issue upon the general replication filed by the complainants.

A great mass of parol and documentary evidence was produced on the hearing, the effect of which, so far as is necessary for the proper understanding of the case, will appear in the arguments of counsel and the opinion of the court.

*G. M. Wharton* and *Meredith,* for complainants:—The

[Skilton *v.* Webster.]

complainants submit that the following facts and averments have been proved. 1. The existence in this country, since 1754, of a denomination of Christians, called the associate church—their division into sessions, presbyteries and a synod—and the respective organization and powers of those bodies, as set forth in the bill. 2. The organization of the associate congregation in Walnut street, Philadelphia, in 1790—its subsequent incorporation in 1802—and its subordination originally to the associate presbytery of Pennsylvania, and subsequently to the associate presbytery of Philadelphia—and the existence of the associate synod of North America as the supreme judicatory of the associate church in this country. 3. The membership and citizenship of the complainants, and their consequent interest in the property of the said congregation, as forming a part of the *cestuis que trust*. 4. The setting forth of the principles of said church in the declaration and testimony, adopted at Pequa, August 25th, 1784, and the character of those principles as stated in the bill. 5. The acquisition, by the said congregation of the real and personal property mentioned in the bill, and its tenure upon the trusts stated therein. 6. The call of respondent, Webster, to the pastorship of said congregation, in 1837, in accordance with the principles of the declaration and testimony—his acceptance of that call, and his subordination, as such pastor, to the presbytery and synod. 7. The charges brought against Webster in 1845, and his orderly trial thereupon before the proper church court—his conviction—and his interlocutory and final suspension—and the character and effect of such suspension as stated in the bill. 8. The disorderly declinature and secession of Webster and his adherents—their attempt to change the presbyterian character of the congregation, and to make it an independent ecclesiastical body—and the protest against such a course on the part of the complainants. 9. The recognition of the complainants as the true body or con-

[ Skilton *v.* Webster.]

gregation by the church courts of the associate church, and the condemnation thereby of Webster and his adherents—and the notice to him and to the trustees and elders of the congregation of the proceedings against him, and their result. 10. Webster's continued contumacy—his persistence in the exercise of the office of pastor—and the support and countenance rendered to him therein by the trustees and elders, respondents. 11. The application of the corporate funds of the congregation, by the trustees, to the maintenance of Webster, notwithstanding his suspension, and the use of the property by those who do not adhere to the faith and order of the associate church, as set forth in the declaration and testimony, and the consequent breach of trust on the part of the respondents.

The complainants contend that they are *cestuis que trust* of the property described in the bill—that the defendants are holding and applying the said property to purposes contrary to the trusts thereof—that they ought to be enjoined from so doing, and compelled to carry out the trusts according to the intent of the instruments creating the same. That the property was originally acquired and directed to be held for the use and benefit of a congregation of Christian worshippers in the city of Philadelphia, adhering to the religious principles expressed in the declaration and testimony agreed to at Pequa, by the associate church in Pennsylvania, on the 25th August, 1784, as a prescribed standard of faith and discipline, and for no other use or purpose. That the congregation was, in its formation and organization, a presbyterian one—and the property was acquired and directed to be held for the use and benefit of a congregation adhering to presbyterian principles, and a presbyterial form of church government—and none other.

That the congregation, when formed, and when the property was acquired for its use, was a component and constituent part of the associate presbytery of Pennsylva-

[ Skilton *v.* Webster. ]

nia, and afterwards became part of the associate presby-
tery of Philadelphia—and upon presbyterian principles,
was subject to the ecclesiastical jurisdiction of said pres-
bytery, according to the order and discipline of the asso-
ciate church. That in accordance with said principles, the
associate synod of North America was formed, and, when
formed, became the supreme judicatory of said associate
church, of which the said congregation was, and continued
to be, a component part. That this relation and subordi-
nation was unanimously recognised, admitted, and practi-
cally carried out from the formation of the congregation
and acquisition of the property, in 1790, until the year
1845—a period of fifty-five years.

That the respondent, Webster, was ordained a minister
of the associate church, and installed as pastor of said
congregation, according to the form of presbyterian church
government, and to the book of discipline of said church,
and under and in subordination to the authority of the
presbytery and synod aforesaid—and without such ordina-
tion, installation, and subordination no public worship could
have been rightly had in the church edifice, according to
the principles of the declaration and testimony, and the
trusts of the property. That the said connexion between
the said Webster and the said congregation, on the one
part, and the said presbytery and synod on the other, could
only be rightly severed on the part of the former by a
radical change or actual violation of their religious profes-
sion on the side of the latter, and that change or violation
persisted in after the use of all possible means by the dis-
sentients to reclaim the offending and erring party. That
the act of the courts of the associate church in the convic-
tion and suspension of respondent, Webster, after due trial,
is final and conclusive upon the civil tribunals—and that
the celebration of public divine worship in the church edi-
fice under his ministry, notwithstanding such suspension, is
a violation of the trusts under which the property is held,

[ Skilton *v.* Webster. ]

inasmuch as said Webster and his adherents (including all the other defendants) have thereby departed from the religious principles of doctrine and order agreed to at Pequa.

That the course of said Webster has arisen entirely from the fact of judicial proceedings having been instituted against him in the courts of the associate church, and from a desire to escape from their necessary consequences. That even if said Webster's course is founded upon a difference between himself and the majority of the synod and presbytery with respect to the true meaning of the standards of the associate church, and the propriety or impropriety of altering the language of the Westminster confession in some particulars, yet that the decision of the majority of the regular tribunals of the associate church upon those points, is final and conclusive upon the ministers and congregations of the same, and will be so considered by the civil tribunals. Both sides claiming to be in the right, the court must either, first, permit the party in possession, however small its numbers, to retain possession without inquiry; a course which might lead to a gross abuse of trust—or, secondly, assume the majority to be in the right, a course consistent with general principles in this country —or, thirdly, enter into an investigation of the merits of the theological dispute.

If the court should decide to investigate the differences alleged by the respondents to have caused their separation from the body with which they admit themselves to have been heretofore connected, and to pronounce upon the propriety of such separation, as tested by the principles of the doctrine and order of the associate church, the complainants contend,—that no act has been done by the associate presbytery of Philadelphia, or the associate synod of North America, amounting to a departure from the religious principles agreed to at Pequa, and that the secession or separation of Webster and his adherents has been contrary to these principles. That the doctrine of the Westminster

confession is not the doctrine of the associate church in North America, except in so far as it accords with the declaration and testimony, the latter being the main subordinate standard of that church. That no act has been done by the presbytery or synod, nor intention expressed to do any act contrary to the principles of the declaration and testimony. That the utmost which has been done by either of those bodies, with respect to the language of the Westminster confession, has been to declare an intention not to object to an alteration therein, in the chapters relating to the powers of the civil magistrate; said declaration of intention having reference to the declaration and testimony as the standard of profession on this point—and the specific alterations subsequently proposed by a committee being in no wise adopted by the presbytery or synod, but merely transmitted by the latter as an overture for the consideration of the inferior church courts.

That the principle of secession, as held by the associate church, does not recognise the right of any number, at their mere will or pleasure, to secede from the majority, and by such act to become, or to continue to be, the true associate church, and to take with them the particular property of which the separating minority may happen, at the time, to have the possession, and to hold it against the will of, and to the exclusion of, the majority. Nothing short of the affirmative of such a proposition will justify the retention of the property in dispute by the respondents.

The following authorities are relied on : *Unangst* v. *Shortz*, 5 Wh. 506, 521 ; *Com.* v. *Green*, 4 Wh. 531 ; *Attorney Gen.* v. *Pearson*, 3 Merivale, 400 ; *Den* v. *Bolton*, 7 Halst. 214 ; *Means* v. *The Presbyterian Church*, 3 W. & S. 303 ; *German Reformed Church* v. *Com.* 3 Barr 282 ; *App* v. *The Lutheran Congregation*, 6 Barr 201 ; *People* v. *Steele*, 7 Penn. L. J. 324 ; *Methodist Episcopal Church of Cincinnati* v. *Wood*, 5 Ham. 283 ; *Baker* v. *Fales*, 16 Mass. 488, &c.; *Stebbins* v. *Jennings*, 10 Pick. 172 ; *Milligan* v. *Mitchell*, 1 Myl. &

[ Skilton *v.* Webster. ]

K. 446, S. C. 3 Myl. & Cr. 433; *Attorney Gen.* v. *Pearson,* 7 Simons, 290; *Attorney Gen.* v. *Shore,* 7 Simons, 290, in note; *Trustees* v. *Sturgeon,* 9 Barr 321.

*Perkins,* for respondents:—The founders of the associate congregation in the city of Philadelphia, retained their temporalities in their own hands, and transmitted them to their congregational successors, to be managed in manner and form as set forth in the deed conveying the property to them, and in their act of incorporation. But they did not subordinate their property to any ecclesiastical court whatever; nor did they leave it subject to the direct or indirect action of any such court. The right of secession is fundamental in every branch of the associate church, whenever any may judge such a step proper or necessary; and all the ecclesiastical censures, which the majority may inflict upon the seceding minority, are held to be absolutely null and void in every particular. Gib's Display, vol. i., pp. 36, 37; Div. Right of Presbytery, 255.

The associate synod of North America, by their vote of 1844, agreeing to alter the Westminster confession of faith, violated the integrity of the church and their covenant obligations to their people. That agreement was not sent down in overture to inferior courts for their judgment, but was an arbitrary act of usurpation, by which said synod changed the constitution of the church, the people willing or not willing. Respondents' cause has been regularly appealed, and is now pending before the only proper and competent tribunal, the united associate synod of original seceders in Scotland, who are the lawful successors of the general associate synod of Scotland, according to the compact of 1788, which has been recognised and acted upon, by both the parties, down to the present time. The associate synod of North America are not the only supreme judicatory of the associate church in this country. There are two others supreme in the same sense that they are,

[ Skilton *v.* Webster. ]

viz.—the associate synod of North America, re-organized in 1841; and the associate presbytery of Philadelphia, re-organized in 1845. There are also three other ecclesiastical judicatories who have descended from the associate church in this country, who are equally supreme, viz.—the associate reformed synod of the south, the associate reformed synod of the north, and the associate reformed synod of the west. Respondents are in the full possession of all the doctrines, ordinances, government and discipline which have at any time belonged to any branch of the associate church, and have hitherto conducted and are now conducting both their temporal and spiritual affairs according to the true design of their founders. They were the majority of the congregation, as ten to one, when the complainants withdrew from them. They have maintained regular and unbroken succession in their corporate capacity from their founders to the present day, by the regular election of trustees, who have administered their temporal affairs according to the letter of their charter. This is not controverted.

The powers of sessions, presbyteries, and synods are not as set forth in complainants' bill, which omits the fundamental right of secession. The membership of complainants ceased by their own voluntary withdrawal from the church of respondents without opposition, dissent, complaint, protest, or appeal from any act done by respondents. The character of the principles adopted at Pequa, 1784, are not as stated in complainants' bill, but those principles require, in the most unequivocal and explicit manner, the maintenance of the Westminster confession intact, as adopted by the church of Scotland, 1647, and as adopted and explained, not altered, by the associate presbytery of Pennsylvania in 1784. The respondents have neither changed nor attempted to change the presbyterian character of the congregation, but have maintained it, together with the right of secession, which the congregation

always possessed; and respondents are now, as they have always been, in the full enjoyment and free exercise of all presbyterial powers and privileges.

The complainants contend that the decision of a majority of the tribunals of the associate church is final, and will be so considered by the civil tribunals; yet they call upon the latter to say that no act has been done by said ecclesiastical tribunals, "amounting to a departure from the religious principles agreed to at Pequa." Respondents submit that they have proved a wide departure from the principles agreed to at Pequa, both in doctrine and government. To permit the majority to decide upon the right of the minority to secede, would effectually abrogate that right, as the majority in every instance have condemned the seceding minority. The application of the corporate funds by the respondents, is not a breach of trust, but has been, in all respects, according to the design of the original founders, which was to continue the property, together with the income therefrom, in the full possession and enjoyment of their lawful successors for ever, who should continue, not in subordination to the associate presbytery of Pennsylvania, or their ecclesiastical successors, but who should continue to adhere to the religious principles adopted at Pequa in 1784, by the associate presbytery of Pennsylvania. And the reason of all this was, that their act of incorporation might conform to the fundamental right of secession, and that the congregation might exercise that right without any forfeiture or even hazard of their temporalities, and escape the calamity which had befallen Mr. Marshall (their founder) when the secession of 1782 occurred.

Respondents submit that the history of the associate church in Scotland, and those secessions which have taken place, are all-important, as they are fully proved by authentic documents, and by the evidence both of complainants and respondents; and furnish a perfect justification of the course pursued by respondents. It is true, as com-

[ Skilton *v.* Webster. ]

plainants' allege, that "nothing in that history, or in the history of the associate church in this country, affirms the right in the seceding party to carry off the property with them from the majority of the ecclesiastical body with which they were connected; but altogether the contrary." This is the very reason why complainants should not be permitted to carry off with them the property of respondents, who constitute a very large majority of the congregation, as ten to one, from whom they have seceded. This admitted principle of complainants is all that respondents desire; because the associate synod of North America never contributed to the property of respondents, never were *cestuis que trust*, never were incorporated in any manner with the congregation, never had a voice directly or indirectly in the management of its temporal affairs, and are not named as complainants, nor could they be complainants, had they been so named.

The union with the original seceders in Scotland, is not, as alleged by complainants, a union of the supremacy of one synod over another, but a compact of two co-ordinate courts having equal power, with a right of appeal from one court to the other by any of the members of either church on doctrinal questions; such as are now in controversy. This compact was formed in order that their ecclesiastical union might be continued upon a mutual agreement in sentiment, or discontinued when it should be found that this agreement in sentiment ceased to exist; and on this agreement appeals or references have been made by the members of one body to the other since 1788, down to 1846, a period of sixty years. The reference and appeal of respondents to the united associate synod in Scotland, is not inconsistent with any claim of congressional independence set up by respondents. On this point they have asserted, and submit that they have proved a congregational independence in regard to temporalities, while they acknowledge either an ecclesiastical submission to the autho-

[Skilton *v.* Webster.]

rities of the church, or secession, as the only lawful alternative. The question is not, whether the alteration of the Westminster confession, agreed to by the synod in 1844, be repugnant to the declaration and testimony, or not. They agreed to alter, without consulting the church, and without knowing what the alteration should be. They expunged, but filled the chasm with no substitute.

The complainants plead, " that the decision of the majority of the regular tribunals of the church upon these points is final and conclusive upon the ministers and congregations of the same, and will be so considered by the civil tribunals." If complainants mean that the civil tribunals will hold the decisions of church courts as final and conclusive in every thing spiritual, respondents have nothing to object. *But if they mean that the civil tribunals will hold the decisions of church courts final and conclusive in regard to rights of property not their own, respondents must object in the most decided and unequivocal manner. They hope never to witness the day when ecclesiastical courts shall possess jurisdiction over the rights of any species of property except their own.*

The defendants further contend, that the complainants have mistaken their remedy. If they are entitled to the possession of the church and lot, they can have full and complete redress by ejectment, in which the defendants would be entitled to a jury trial. *The Baptist Church in Hartford* v. *Witherill*, 3 Paige Ch. 297; *Lawyer* v. *Cipperly*, 7 Paige Ch. 281. The church and property belong to a congregation adhering to certain principles; and not to one in subordination to, or connexion with any particular ecclesiastical jurisdiction. The circumstances under which this congregation was originally organized, the occasion of forming it, and the men by whom it was done, and who originally composed it, show their object to have been to secure the property for the use of those who held, and who should hold, certain principles,

[ Skilton *v.* Webster.]

whether they were or were not in subjection to, or in connexion with any particular ecclesiastical body.

Neither in the deed of trust, nor in the charter subsequently obtained, is subordination to any ecclesiastical court whatever required on the part of the congregation. There is no recognition of, nor allusion to any church, or presbytery, or synod, or other ecclesiastical body to which the congregation must belong, to entitle them to the use of the property. All that is required of them is that they adhere to the religious principles adopted at Pequa in 1784. If they do adhere to these principles, they will keep the property, though every church and ecclesiastical body in the land rejected them for heresy; and should depose the minister and excommunicate the members of the congregation for their adherence. *The Presbyterian Congregation* v. *Johnston*, 1 Watts & Serg. 1; *Duncan* v. *The Ninth Presbyterian Congregation*, 1 W. & S. 37; *Miller* v. *Gable*, 2 Denio, 511.

*G. M. Wharton* and *Meredith*, in reply:—If the principle of secession is supposed by the respondents to be established by the history of the Scottish church, the complainants submit, that nothing in that history, nor in the history of the associate church in this country, affirms the right in the seceding party to carry off the property with them from the majority of the ecclesiastical body with which they were connected, but altogether the contrary. The evidence shows, that this congregation was formed, and the funds contributed upon the principles of presbyterianism, as set forth at Pequa, in the declaration and testimony —that neither the corporation, nor any existing trustees or elders, nor the congregation for the time being, have any absolute estate in the property, but that the same is held, and should be administered by the existing officers, for the use and benefit of such as adhere to those principles, and for none others.

[ Skilton *v.* Webster. ]

The qualifications of the Westminster confession were distinctly pointed out in the declaration and testimony, and the marks of difference which were so pointed out by the framers of the latter standard, (including Messrs. Marshall and Clarkson) and were made chief grounds of their testimony, viz. the powers of the civil magistrate *circum sacra*, or about religious matters, have been attempted to be removed by the respondent, Webster, and for these deviations of his from the doctrine of the declaration and testimony has he, among other things, been condemned by the presbytery and synod. Any subordination of the associate church in this country to the Scottish church was long ago abolished, and the associate synod of North America has been, for many years, the supreme judicatory of the associate church here. The associate synod of North America has never altered the Westminster confession, nor even agreed to any alteration repugnant to the declaration and testimony.

The complainants, in conclusion, contend, that the evidence establishes no such distracting and destructive principle, as a tenet of the associate church, as was argued for the respondents, viz., " that the associate synod of North America was not the supreme judicatory over any persons who may have seceded on account of any supposed defection from the standards, nor have church sentences any effect in such cases; the church judicatory having only authority over those who voluntarily recognise their jurisdiction :"—on the contrary, the principles of that church recognise the act of the majority as necessarily of authority in ecclesiastical matters.

Rogers, J.—This is a bill in equity filed by the complainants as members of a church incorporated by the commonwealth of Pennsylvania, by the name of " The Associate Congregation in the City of Philadelphia." The complainants are members of the church, and the defend-

[ Skilton *v.* Webster. ]

ants are the trustees of the corporation, certain ruling elders of the congregation, the Rev. C. Webster, claiming to be the pastor thereof, and the corporation itself. The object of the bill is, to compel the defendants, (who, it is alleged, have refused, and still refuse to do so, contrary to their duty, and the principles, rules and order of the church) to permit clergymen, in full communion with the presbytery and synod, and who adhere to the principles and practice of the associate church, with which they are in connexion, to minister to the congregation in the church edifice, and that the trustees may be compelled to appropriate the profits to the support of such ministry, and none other; that the trustees and C. Webster, who with the assent of the trustees, has officiated in the church, not being a qualified minister in full communion with the said presbytery and synod, and who does not adhere to the principles and practice of the associate church, having been suspended from his office, may be compelled to account for the property since the time of his suspension; that the trustees may be removed from office for their breach of trust, and others appointed in their stead, and that the books, papers, records and property of the said congregation, be delivered to such new trustees; that the said Webster may be restrained and enjoined from officiating in any way as minister in such corporation, or from intermeddling with the spiritualities or temporalities thereof, and that the trustees and ruling elders be also restrained and enjoined from permitting the said Webster so to do, and from appropriating said property in any other way than for the support of a minister in regular standing and full communion as aforesaid, and settled according to the principles and practice of the associate church; and, finally, from interfering with the occupation of the said church edifice by the complainants and other members of the congregation who adhere to the said presbytery and synod, in order to the administration of divine ordinances according to the faith and discipline of the associate church.

[Skilton *v.* Webster.]

The complainants, being proved to be citizens of the commonwealth, and members of the corporation and the church, have the undoubted right to file a bill, alleging the grievances of which they complain, and requesting relief, such as contained in the prayer of their bill. If the allegation stated be true, and there be nothing to make this an exception to the general rule, it is the duty of the court to grant relief, without any regard to the comparative numbers of the respective parties in the congregation. Such considerations cannot enter into the merits of the case. The cause must be ruled on adjudged cases, which are uniform, so far as this question is concerned.

The statement in the prayer of the bill, which shows the objects sought to be attained by the bill, also shows that there is nothing in the first point of the defendants, viz., that the complainants have mistaken their remedy. If they are, (say they) entitled to the possession of the church and lot, they can have full and complete redress by ejectment, in which the defendants would be entitled to a jury trial. That if the complainants are the persons entitled to the possession of the lot and buildings, they can recover, in ejectment, not only the possession, but the mesne profits. I agree, that if the complainants can, (as is alleged) have full and complete redress by ejectment, a court of equity has no jurisdiction, and it would be our duty to refer it to the appropriate tribunal; as it is a rule in equity, well settled, that when a person has adequate relief at law, chancery will not entertain jurisdiction. But cases where chancery has refused to interfere are where the remedy was full, complete and adequate. It is true, in an ejectment, the complainants, if they have title, may recover the possession of the premises and mesne profits; but that is the extent of the redress to which they would be entitled. A very general ground is asserted for the jurisdiction of a court of equity, and that is, not that there is not a remedy at law, but that the remedy is more complete and adequate

Q

[Skilton *v.* Webster.]

in equity, and besides it prevents a multiplicity of suits. 1 *Story's Eq.* § 437. But ejectment would not be a complete remedy, as is obvious from the prayer of the bill. The redress would be inadequate to the occasion; and, as the remedy is more complete and adequate in equity, and has the further recommendation that it prevents a multiplicity of suits, we dismiss this part of the respondents' defence.

The exceptions already noticed are formal, rather than striking at the substance and real merits of the question, and perhaps the objection which I am now about to examine comes within the same category, being in the nature of a dilatory plea, leaving the principal points in the case entirely untouched. I allude to the allegation, that the respondents' cause has been regularly appealed, and is now pending before the only proper and competent tribunal, the united associate synod of original seceders in Scotland, who are the lawful successors of the general associate synod of Scotland, according to the compact of 1788, which has been recognised, as is alleged, and acted upon by both parties, down to the present time. If, on investigation, it should be as stated, I should think it my duty to dismiss the bill, or, at any rate, delay proceeding in this case, until the question there pending should be decided by the only competent tribunal. For the decisions of ecclesiastical tribunals, in all cases on doctrine, order, and discipline, are conclusive in the common law courts. Indeed, we are not competent to judge of nice questions of theology, arising out of their respective discipline or doctrine. We leave it to those who make it the business of their lives to master the intricate and perplexing questions which often arise in the various protestant churches, and sometimes even in the infallible church itself.

That there was a reciprocal right of appeal existing between the associate presbytery of Pennsylvania, and the associate synod of Scotland, from at least the year 1788, and continued for a considerable length of time, appears to

[ Skilton *v.* Webster. ]

be placed by the evidence beyond all doubt. It, however, is not so clear, that this right of appeal has been recognised by the respective churches, since the establishment of a synod by the associate church in this country. But, be this as it may, before we can agree to suspend the action of the court, we must be satisfied that an appeal has been taken, and the grounds of the appeal. When the question was asked,—from what the defendants had appealed, when, and by whom the appeal was taken,—no satisfactory answer was given. It must be remarked, the right of appeal is limited, and only lies in the case of any difference which may arise in the presbytery of Pennsylvania, about the profession of the faith, or any truth or duty affecting their connexion with the associate synod of Scotland. As to what relates to scandals, or causes of a personal or private nature, the associate synod of Scotland do not undertake to assume jurisdiction. They wisely judge the prosecution of such appeals would be inexpedient and improper, at such a distance. Appeals of that kind, as they say, they have, from their intercourse with the presbytery for thirty-five years, no reason to expect. (Exhibit B, page 46, defendants' testimony.) The appeal then being restricted within narrow limits, it is not unreasonable we should be desirous of knowing the reasons of it, the persons who made it, when it was taken, and of what errors or grievances they complain. It is more particularly necessary in this case, as we cannot tell whether the appeal was taken from the sentence of the ecclesiastical court, suspending the pastor of the church, or from errors about the profession of the faith, or any truth or duty affecting their connexion with the associate synod of Scotland. All the evidence we have of the appeal, is contained in the minutes of the presbytery formed by Messrs. M'Naughton and Webster, the testimony of M'Naughton, and a letter signed by a certain Thomas M'Crie, directed, as I suppose, to M'Naughton. In the proceedings of the presbytery, of

the 11th Nov., 1845, there is this minute: " N. B. The presbytery will present all their proceedings to the first meeting of the constitutional synod for review, and will abide by their decision." Mr. M'Naughton says, the presbytery did present their proceedings in writing to the constitutional synod, but when, he has not informed us, nor has he annexed a copy of his communication. He says, he has an answer from the synod; and in proof of it, produces the letter already referred to, signed by Thomas M'Crie, an individual of whom we know nothing, except what is derived from his own letter. If the defendants had produced a certificated extract from the minutes of the constitutional synod, verified by oath, containing a certificate that an appeal had been filed, accompanied with a copy of the communication from the presbytery, there would be some evidence of the fact.. But all we have to rely on is proof that a written communication was made, which is not produced, and the letter of Thomas M'Crie, of whom we know nothing, not under oath, stating that it had been received and read, at a *pro re nata* meeting, called in June, 1847. At that meeting, the synod came to a resolution somewhat, as the writer states, in the following terms. That in the absence of all representation from the other party in this case, and at such a distance from the scene of action, necessarily prevented from gaining a full and accurate knowledge of the facts, the synod found itself unable to pronounce any opinion on the question, and remits it for further consideration, till next ordinary meeting. It appears that no representation or statement was made by the synod of the associate church on this side of the Atlantic. Why this was—from what cause this omission arose, we know not. Whether it proceeded from want of notice of the pretended appeal, or other cause, it would be useless to conjecture. The letter is dated the 7th Sept., 1847; of course, the next ordinary meeting would be some time in the following year. Since then, we have no farther

information as to the action of that body, and perhaps it is not an unreasonable presumption that none is intended, as the proposition or overture of synod, to which such objection is made, being rejected by the presbyteries, further proceedings have not been had in favour of the union of the associate and associate reformed churches. It must also be remarked, that no proof has been given of notice of the appeal to the synod, and the presumption is, that none was given. Taking all the circumstances into consideration, I have come to the conclusion, it would be unjust to the complainants to dismiss their bill, or to delay proceedings on that account.

And this brings me to the consideration of the remaining point, on which the rights of the parties must ultimately depend. The defendants insist, that the founders of the associate congregation in this city retained their temporalities in their own hands, and transmitted them to their congregational successors, to be managed in manner and form as set forth in the deed conveying the property to them, and in their act of incorporation. That they did not subordinate their property to any ecclesiastical court whatever, nor did they leave it subject to the direct or indirect action of any such court. And, further, that the right of secession is fundamental in every branch of the associate church, whenever any may judge such a step proper or necessary: and all the ecclesiastical censures which the majority may inflict upon the seceding minority are held to be absolutely null and void, in every particular.

In support of the first proposition, the defendants rely on the following clause of the deed for the property in controversy. Now, " be it known, that the said trustees, and their successors in office, do hold the said church and lot of ground in trust for the associate congregation in the city of Philadelphia, who adhere to the religious principles expressed in a declaration and testimony for the doctrine and order of the church of Christ, agreed to at Pequa, the 25th

[ Skilton *v.* Webster. ]

day of August, one thousand seven hundred and eighty-four, by the associate presbytery of Pennsylvania." And also on the charter, which is to the same purport. The defendants contend, that the founders did not intend to subject their property to any ecclesiastical court, nor did they leave the congregation subject to the direct or indirect action of any such court. That all that is required is, that the *cestuis que trust* should adhere to the religious principles expressed at Pequa, in 1784. That there is no allegation, much less any proof, that the defendants, or those whom they represent, have in any particular departed from those principles. On the contrary, it is their strict adherence to those principles, and their refusal to depart from them in any, the slightest particular, that has brought upon them this suit. If this be true, then I agree the cause is with the defendants. Thus, in *The Presbyterian Church* v. *Johnston*, 1 W. & S. 1, which was the case of a presbyterian church refusing to acknowledge either the old or new school general assembly, the chief justice, on page 40, puts the decision in the case on the fact, that no particular presbyterian connexion was prescribed by the founders, or established by the charter. So, in *Miller* v. *Gable*, 2 Denio 511, the vice-chancellor says, " I think there is a plain distinction, in sound reasoning, and supported by authority, between the dedication of property to support peculiar tenets, and its dedication to support such tenets in connexion with, and in subjection to, a particular church government." And again, he says, " Property may be given to the support of tenets, without subjection to any ecclesiastical power which upholds those tenets." The chancellor relies on the case of *Den* v. *Bolton*, 7 Halst. 206, as illustrating and supporting the above principle. The result of the cases I take to be this, that when it appears that it is not dedicated to support tenets in connexion with a particular church government, then it is not subject to any ecclesiastical power which upholds those tenets. If,

[ Skilton *v.* Webster.]

then, it appears that the deed of the property, the declaration of trust, and the charter, are to be so construed,,I agree there is an end of the complainants' bill, which must be dismissed.

These principles being conceded, let us examine the first point in connexion with these tests. The proposition is, that the church and property belong to a corporation adhering to certain principles, and not to one in subordination to, or connexion with, any particular ecclesiastical jurisdiction.

The defendants seem to consider, that inasmuch as there is nothing in the deed of trust, or charter, which expressly, or by necessary implication, makes it in subordination to any ecclesiastical court, no allusion to any church, or presbytery, or synod, or other ecclesiastical body, to which the congregation must belong, the result is, that this congregation or corporation must be taken, not in subordination to, or connexion with, any particular ecclesiastical connexion. But I cannot agree to this view of the principle; for the very reverse of it is the true rule; particularly as applied to a presbyterian church: *primâ facie*, they are subject to the jurisdiction of the ecclesiastical courts, and if they wish exemption from their jurisdiction, it is necessary for them to show most clearly that such was the intention of the founders of the church. It may, in truth, be matter of much doubt, whether the presbyterian church would admit into their connexion any congregation, which would in their charter, or otherwise, claim an exemption or independence of the ecclesiastical courts of the church. They could not, I think, agree to do so, consistently with their belief, that the ecclesiastical courts are a divine institution, and that due obedience and subordination are due to their decisions. It would, in fact, be admitting to their communion a connexion not presbyterian, but a *quasi* congregational or independent church. But, be this as it may, let us examine the case on the grounds the defendants have chosen to place it.

[ Skilton *v.* Webster. ]

The circumstances, say the defendants, under which the congregation was originally organized, the occasion of forming it, and the men by whom it was done, and who originally composed it, show their object to have been, to secure their property for the use of those who held and should adhere to certain principles, whether they were, or were not, in subjection to, or in connexion with, any particular ecclesiastical body. In support of these views, the defendants gave a history of the causes which led to the formation of the congregation, which it would swell this opinion to an unreasonable extent to incorporate; it having resulted, as they say, in the loss of their property in Spruce street, by its being in trust, not only for those who held certain principles, but by their being required to be in connexion with a particular ecclesiastical body: accordingly, the Rev. William Marshall, and those who had been turned out with him, determined to protect any property they might thereafter acquire from being affected by any ecclesiastical body, or the censures of any such body. The founders were anxious to secure adherence to principles, not to ecclesiastical bodies.

Now, giving this view of the case all the weight to which it may be justly entitled, and granting that the Rev. Mr. Marshall, and those who acted with him, endeavoured to prevent this, and all other acquired property from being interfered with and affected by ecclesiastical censure, decision or sentence, the question recurs,—what is the proper construction of the words used in the instrument by which they have declared the uses, intents, and purposes for which the property should be holden? The language employed is the best exponent of the intention of the parties to a contract or declaration of trust. Extraneous evidence and circumstances may be resorted to, in aid of a doubtful construction, although it cannot be legitimately used to control the obvious meaning of the language which parties have chosen to employ. The first remark which I

[Skilton *v.* Webster.]

feel myself bound to make is, if·the intention of Mr. Marshall, and those who acted with him was as the defendants contend, they have been very unfortunate in the language they have used to express their meaning. And this is the more remarkable, because all difficulty on this head could have been so easily obviated by the addition of negative terms, namely,—but not in subordination to, or connexion with, any particular ecclesiastical jurisdiction. This was so obvious, that I cannot help believing this course would have been adopted by such a sagacious man as Mr. Marshall, if he and those who acted with him, were as desirous as represented to protect their property from being interfered with, or in any manner affected, by ecclesiastical censure, decision or sentence. But the truth of the matter, I presume is, that although Mr. Marshall, when smarting under his supposed wrongs, may have entertained such views, yet, when he had time to reflect, he recollected he was a presbyterian, and not a congregationalist; and hence, he omitted from the declaration, and the charter, all negative words of the description above suggested, and all words calculated to convey that idea. Hence, whatever may have been their intention originally, we are not without reasons for believing, that intention may have been modified or changed. Such an inference is by no means improbable, when we advert to the declaration of trust, and the charter. The words of the declaration of trust and charter, as above stated, are, that the church and lot of ground are to be held in trust for the associate congregation, who adhere to the religious principles expressed in a declaration and testimony for the doctrine and order of the church of Christ, agreed to at Pequa, &c. In order to understand the meaning of the parties, we must resort to the declaration itself, and inquire, what is meant by religious principles, as expressed at Pequa? What is to be understood as the doctrine and order of the church of Christ, as then agreed to? The declaration at Pequa, be it observed,

[Skilton v. Webster.]

expressly recognises the Westminster confession of faith,
as they are received in the declaration and testimony. "It
belongeth to synods and councils (vide 31st chapter, § 3,
confession of faith) ministerially to determine controversies
of faith, and cases of conscience; to set down rules and
directions for the better ordering of the public worship of
God, and government of his church; to receive complaints
in cases of mal-administration, and authoritatively to deter-
mine the same, which decrees and determinations, if con-
sonant to the word of God, are to be received with reve-
rence and submission, not only for their agreement with the
word, but also for the power whereby they are made, as
being an ordinance of God, appointed thereunto, in his
word." And in accordance with this, are the ordination
vows of ministers in the church; vows, be it remarked,
which the Rev. Messrs. Webster and M'Naughton must
have taken at their ordination. They acknowledge their
belief in the whole doctrine of the confession of faith and
catechisms, larger and shorter, agreed upon by the assem-
bly of divines at Westminster, as received in the declara-
tion and testimony. And they expressly acknowledge
presbyterial church government to be a divine institution,
and appointed by Jesus Christ, the only king, head and
lawgiver of the church; to continue in it to the end of time.
If there be any thing clear, it is, that it is the belief of all
who adhere to that denomination of Christians, that pres-
byterial church government is a divine institution; that
this is one of the fundamental principles of all presbyterian
churches, including the associate church, and all those who
adhere to the principles agreed to at Pequa. Indeed, the
wonder is, that this should be doubted by any person, par-
ticularly by Messrs. M'Naughton and Webster, ordained
ministers of that church.

We come now to the consideration of the next, and only
remaining point of the defendants' case, namely,—that the
right of secession is fundamental in every branch of the

associate church, whenever any may judge such a step proper or necessary; and all the ecclesiastical censures which the majority may inflict on the seceding minority are held to be absolutely null and void, in every particular.

That the right of secession is an inherent and distinctive principle of the associate church, is fully established by the testimony of Drs. Stark, Bullions, M'Naughton, and Beveridge, as also by the standards of the church. Thus in *Gib's Display*, p. 36, 37, in note, the following language is held: "We are indeed bound at our ordination to subject ourselves under the judicatories of the church, but it is not an absolute subjection that we engage, unto. It is not a blind and implicit obedience, that we bind ourselves unto, but a subjection in the Lord; a subjection qualified and limited by the word of God, and the received and known principles of the church." The declaration and testimony adopted at Pequa is equally clear and distinct. "We testify against those who teach that we ought not to separate from any church, because of its corruptions, and its obstinacy in them, while we have just cause to believe that the ordinances of grace dispensed are blessed of God, as a means of saving sinners, and edifying saints. This is as much as to say, that we ought not to separate from a corrupt church, as long as we are assured that we leave no righteous person behind us in it, that we must continue in it, till we are assured it becomes wholly a synagogue of Satan; and that we must let a church and state utterly perish, before we take any effectual means of restoring it. We testify also, against all those who, hearkening to such teachers, continue in communion with a church in which the truth is denied, its enemies not censured, and the testimony of such as adhere to it suppressed or despised; especially against those who, after a door is opened, and a call given them, yet refuse to come out from such corrupt societies." The standards of the church teach, that this right of secession is fundamental in every branch of the

[Skilton *v.* Webster.]

associate church, when any may judge such a step proper or necessary. Nay, not only that it is a right, but that it is a duty, to separate from a church corrupt in principle, or practice, and fallen into gross error and doctrine. They are commanded to withdraw from every brother that walketh disorderly. *Gib's Display*, p. 36, 37; *Alexander and Rufus*, p. 209, 210; *Div. Right of Presbytery*, p. 255.

The history of this church, which was founded in secession, shows that this right has been perhaps too often exercised. Nor do I understand the right of secession to be denied, except so far as that the complainants contend it was improperly exercised, in this case, because the connexion between Webster and the congregation, on the one part, and the presbytery and synod on the other, could only be rightly severed, on the part of the former, by a radical change or flagrant violation of their religious profession on the side of the latter, and that change and violation persisted in after the use of all possible means by the dissentients to reclaim the offending and erring party. Whether the secession of the congregation and pastor was right or wrong, it is not my purpose to inquire, as it cannot affect the result of the case in any way. That it was precipitate, and, with deference be it spoken, unwise, all must agree. It certainly has the appearance of a step taken to avoid a trial of charges preferred against the pastor of the church.

Leaving this part of the case, let us direct our attention to a much more pertinent and important question, namely, admitting the secession of the congregation and pastor to be correct, what are the consequences of the separation? Have they the right to retain the property, or is it vested in such members as adhere to the great body of the associate church? And this will depend on the solution of another question, namely, whether the secession, in this instance, is to be viewed as the secession of the majority, or the secession of a minority; in other words, does the

[Skilton v. Webster.]

majority of the congregation, which the defendants undoubtedly are, or the majority of the associate church, in whose right the complainants claim, determine the right of property? The title to the estate is the real question, as is the case in all ecclesiastical disputes, professions to the contrary notwithstanding. On this point, after serious reflection, I see no difficulty. The associate church, represented by the synod, who are the real parties, are the majority; the congregation are the minority. It therefore presents the simple case of a minority, with or without cause, seceding from the majority of the church. And here let me observe, that the decisions of ecclesiastical courts, like those of every other judicial tribunal, are final, as they are the best judges of what constitutes an offence against the word of God, and the discipline of the church. A party thinking himself aggrieved by the decision of a lower church tribunal, should appeal to a higher. *German Reformed Church* v. *Com.* 3 Barr 282. That the majority retain the right, and the seceding party relinquish it, is shown by the following authorities:—*Unangst* v. *Shortz*, 5 Whart. 521; *Means* v. *The Presbyterian Church*, 3 W. & S. 303; *German Reformed Church* v. *The Commonwealth*, 3 Barr 282; *App* v. *The Lutheran Congregation*, 6 Barr 201; *People* v. *Steele*, 7 Penn. L. J. 324; *The Methodist Episcopal Church of Cincinnati* v. *Wood*, 5 Hamm. 283; *Baker* v. *Fales*, 16 Mass. 488. In the *Commonwealth* v. *Green*, it is ruled, that a popular body is known only by its government or head. In case of division, the party having the numerical superiority is entitled to represent and perform the functions of the original body.

In *Den* v. *Bolton*, EWING, C. J., says that to constitute a member of any church, two points at least are essential; a profession of faith, and a submission to its government. It was held, that a part of a congregation, separating from, and renouncing the jurisdiction of a classis, (or presbytery) although declaring that they retained the faith and doctrines

of the reformed Dutch church, and uniting with another classis, lost their right to the corporate property. That case is very similar to the present. The principle is the same, the only difference being, that they united themselves with another presbytery, whereas here they formed a presbytery for themselves, claiming that they are the true and legitimate associate church.

In *App* v. *The Lutheran Congregation*, a devise to the Lutheran congregation in Selin's Grove, was held to designate that portion of the old congregation which continued to worship in the old church and adhered to the government, form of worship, and doctrines in practice when the bequest was made.

In the case of the *People* v. *Steele*, S. C. New York, 7 Penn. Law Journ. 324, it is held, the great and paramount duty of trustees of religious corporations is to see that the temporalities committed to their charge are fairly and fully devoted to the purposes of their founders; and consequently, when the intention of the donors was the establishment of a methodist episcopal church, in connexion with the general church of that denomination, the act of the trustees in refusing to receive a preacher appointed by the bishop, is an act of insubordination. The intention of the donors can be inferred from the terms of the grant, and the cotemporaneous acts of parties. The trustees cannot be excused in their insubordination, because they are sustained by a majority of those to whom they owe their appointment. That authority applies to the present case, for here the trustees have been guilty of an act of insubordination, in withdrawing themselves from the jurisdiction of the associate synod, and it is no excuse for them, that the majority of the congregation, with their pastor at their head, have been guilty of the same offence.

So also seceders from the methodist episcopal church, who organize a separate conference, and reject the office of bishop, are not entitled to any part of the property of the society from which they secede.

[ Skilton *v.* Webster. ]

The authorities cited conclusively prove, that the defendants, who are a minority of the whole church, are not entitled to any part of the property of the church from which they thought proper to separate. In that respect, they place themselves in the same category with an individual who leaves a congregation or church of which he was a member, who, it will not be pretended, would be entitled to take with him any part of the property which belongs to the corporation or church to which he belonged at the time of his separation.

It is nothing to the purpose, that the defendants are, numerically, the majority of the corporation, nor that they remain in possession. Having separated themselves from the ecclesiastical body of the church, formed a new presbytery for themselves, the complainants, who are adhering members, by operation of law, become the corporators, and as such are entitled to the possession. Nor is this view of the case in opposition to any principle of secession, as held by the associate church. The associate church does not recognise so absurd a principle, as that any members at their mere will and pleasure have the right to secede from the majority, and, by such act, to become, or to continue to be, the true associate church, and to take with them the particular property of which the separating minority may happen at that time to have the possession, and to hold it against the will of, and to the exclusion of, the majority. In that respect, at least, they are in union with every Christian church, and it may be doubted whether any church could exist which should incorporate into their system any such destructive principle. A case cannot be found, because none such exists, either in Scotland or in this country, where any such doctrine has been advocated, much less made a rule of action. Strip this case of the drapery with which it has been surrounded by the ingenuity of counsel, and what is its aspect? The associate synod, at least a large party of them, being desirous of a union

[Skilton v. Webster.]

with the associate reformed synod, sent down an overture to the various presbyteries in that connexion, for that purpose, according to the constitution and order of the church. The plan of the union was rejected by the presbyteries, and among others by the presbytery of which the Rev. Mr. Webster, one of the defendants, and the pastor of this church, was a member. This proposition of the synod, for it is nothing more, met in its progress with a most violent and determined opposition, and particularly from Mr. Webster, who published a book on the subject, entitled Divine and Human Rights, which contained, as the presbytery of the church, sitting at Carlisle, supposed, divers defamations and slanders of church courts, and character and motives of individuals, especially ministers of the gospel; that he had pursued divisive courses, deserving of censure, according to the word of God, and the subordinate standards of the church; that he showed contempt of the synod's authority, coupled with injurious misrepresentations of their special acts, and slanderous impeachments of their motives, and lastly, that he had been guilty of such falsehood as deserved censure, according to the word of God, and the subordinate standards of the church. These serious charges, affecting his character as a man, and his standing as a Christian minister, were put into proper form; the libel adopted, and ordered to be put into the hands of Mr. Webster. The presbytery was appointed to meet Nov. 12th, 1845, at the session room of the first associate congregation of Philadelphia; but finding the appointed place of meeting shut against the presbytery, they finally agreed to proceed to the meeting-house of the second associate congregation, and hold their meetings there. When the presbytery met, they found that Webster, instead of meeting and refuting the charge, together with F. W. M'Naughton, another member of the presbytery, had separated themselves from the presbytery the evening before, calling themselves the associate presbytery of Philadelphia,

[ Skilton *v.* Webster. ]

and that they had publicly declared their determination to renounce the authority of the synod, and of the presbytery appointed to try him. In consideration of these circumstances, the presbytery resolved, and they could do no less in the face of such an act of contumacy and insubordination, that these offending brethren should be suspended from the exercise of the gospel ministry and the communion of the church, until they gave satisfactory evidence of repentance.

In my judgment, Mr. Webster greatly erred. A proper respect for his own character, as a Christian minister of the gospel, ought to have induced him to meet and refute the charges alleged against him; but instead of pursuing this obvious and respectful course, which was due to himself and the church of which he was a member, the evening before the meeting appointed for his trial, he secedes from the church, and now, instead of submitting to the sentence of the court, and attempting to give satisfactory evidence of repentance, he denies that he is subject to ecclesiastical censure, and boldly insists that he and those who act with him, are the true representatives of the church organized by the secession of Marshall and Clarkson; that the defendants are in the full possession of all the doctrines, ordinances, government and discipline, which have at any time belonged to any branch of the associate church, and have hitherto conducted, and are now conducting, both their temporal and spiritual affairs, according to the true design of their founders. They further contend, they have made no secession from the associate church; they own her doctrines contained in her profession of faith, they observe the received and approved uniformity of worship, they adhere unto her presbyterian government and discipline, according unto the word of God, and their solemn covenant engagements, and they have not been convicted of any thing in doctrine or practice to the contrary; that they strictly adhere to the religious principles expressed

R

[ Skilton *v.* Webster. ]

in the declaration and testimony for the doctrine and order of the church of Christ agreed to at Pequa. The defendants more than insinuate, that, instead of their seceding from the majority, the majority have seceded from them, an act of folly, (there being no necessity for it,) which majorities seldom, if ever, commit. What may be the effect of the decision of the presbytery on the standing of the Rev. Mr. Webster, as a Christian minister, it is not my province to determine. These questions are best understood by the ecclesiastical bodies themselves, and there it is my purpose to leave them. But so far as it regards the temporalities of the church, it comes within the jurisdiction of the civil tribunals of the country. In the judgment of this court, the defendants have seceded from the associate church, and have brought upon themselves all the consequences of such secession, namely, forfeiture of all the interests which they have heretofore had in the temporalities of the church. I cannot agree that they have adhered to the religious principles agreed to at Pequa, because one of the fundamental principles of the declaration and testimony is, that presbyterial government, consisting of sessions, presbyteries and synods, is of divine institution, and as such entitled to obedience, reverence and respect; and the defendants have repudiated, trampled on, and despised the jurisdiction and sentence of their court appointed to try, and who did try, and convict one of the defendants of divers grave and serious charges, alleged and proved against him.

On the whole case, the court are of opinion, and do decree, that the defendants do and shall permit clergymen in good standing, and full communion with the associate presbytery of Philadelphia, and the associate synod of North America, and who adhere to the principles of faith, discipline, and government of said associate church, to preach, teach, and administer divine ordinances, according to the established and received doctrines of said church, to the first associate congregation of Philadelphia, in the

church edifice in Walnut street, between Fourth and Fifth streets, in the city of Philadelphia; and that the trustees, defendants, viz., said M'Gonegal, Skilton, Donnelly, Auld, Totten, and Smith, do and shall appropriate the funds, property, and effects of said congregation, and said corporation, defendant, to the support and maintenance of such preaching, teaching, and ministration, and none other; and that the said trustees and the said Webster do account for the said property, funds and effects, and the proceeds and income thereof, since the twelfth day of November, 1845. And it is ordered that it be referred to a master to take an account, &c. And for the better taking of the said account, and discovery of the matters aforesaid, the parties are to produce before the said master upon oath, all deeds, books, and writings in their possession or power relating thereto, and are to be examined upon interrogatories as the said master shall direct, who in taking said account is to make unto the parties all just allowances. That the said M'Gonegal, Skilton, Donnelly, Auld, Totten, and Smith be removed from the office of trustees of said congregation, and that they, and each of them, deliver to the trustees to be elected in their place by the said congregation, in pursuance of the charter of said church, all and singular, the books, property, and effects of said associate congregation. That the said Webster be, and he hereby is enjoined and restrained from preaching, teaching, or in any manner officiating as pastor or minister in said church edifice of said first associate congregation of Philadelphia, and from intermeddling in any manner with the spiritualities and temporalities of the same,—and that the said trustees, M'Gonegal, Skilton, Donnelly, Auld, Totten, and Smith, and the said James Auld, Samuel Fulton, John M'Elwee, Robert Lamberton, Samuel Wilson, John Wright and Thomas Sharkey, ruling elders, be and they are hereby restrained and enjoined from permitting said Webster to preach, teach, or in any manner to administer divine ordinances in said

[ Skilton *v.* Webster. ]

church edifice, and from appropriating or in any manner disposing of the funds, property or effects of said congregation and corporation, for any other purpose or object than that of the support and maintenance of a pastor or minister in regular standing, and in full communion with said associate presbytery of Philadelphia, and said associate synod of North America, duly called, settled and inducted as pastor of said congregation, according to the rules and principles of faith and practice, discipline and government, of said associate church. And further, that said defendants be restrained and enjoined from preventing or in any manner interfering with the occupation of said church edifice, by the complainants or other members of said congregation, adhering to the said associate presbytery and synod, for the purpose of having divine ordinances administered therein, according to the principles of faith and practice, discipline and government, of said associate church. And that the said defendants pay the costs of this suit, to be taxed by the clerk.*

* In the methodist episcopal church, the election and ordination of the priesthood by the general or annual conference, the ordination of them by laying on of hands by a bishop and elders, and the fixing of their appointments by the bishop, are cardinal points—the last a distinctive one—it is the rock on which the church is founded: *hence*, where a charter was granted to a congregation represented by trustees, recognising their connexion with that church; an amendment to the charter whose object was obscure, was construed not to give to the trustees of the congregation the right of electing the elder in charge, the effect of which would have been to violate the fundamental articles of the discipline of the church to which the congregation professed to adhere, especially as there had been a usage of thirty years in accordance with the discipline. *Com.* v. *Cornish,* 1 Harris 288.